IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EASCO HAND TOOLS, INC.,<br>ARMSTRONG TOOLS INC., KINGSLEY<br>TOOLS INC., LEA WAY HAND TOOL<br>CORPORATION, AND MATCO TOOLS<br>CORPORATION, | ) ) ) ) ) | Civil Action No. 3:02 CV 1723 (AVC) |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| HU, HOU-FEI, a/k/a BOBBY HU, | ) ) | March 31, 2004 |
| Defendant. | ) ) | |

_____

**DEFENDANT HU'S *MARKMAN* BRIEF
ON CLAIM CONSTRUCTION**

_____

J. Hoke Peacock III
Federal Bar No. ct24230
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096

Michael F. Heim, Esq.
Federal Bar No. ct22416
Jonathan M. Pierce, Esq.
Federal Bar No. ct24417
CONLEY ROSE, P.C.
7100 JP Morgan Chase Tower
Houston, Texas 77002-2912

David B. Zabel, Esq.
Federal Bar No. ct01382
COHEN AND WOLF, P.C.
1115 Broad Street
Bridgeport, Connecticut 06604

Attorneys for Defendant and Counter-Plaintiff,
Hou-Fei Hu, a/k/a Mr. Bobby Hu

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     CLAIM CONSTRUCTION PRINCIPLES...........................................................1

III.    OVERVIEW OF THE TECHNOLOGY AT ISSUE............................................5

IV.     CLAIM CONSTRUCTION FOR DISPUTED TERMS OF THE '387 PATENT........6

    A.  CLAIM 17..........................................................................................................7

        1.  "*ratcheting tool*" ......................................................................................8

            (a)  Hu's Construction ........................................................................8

            (b)  Plaintiffs' Construction...............................................................14

        2.  "*drive member*".......................................................................................15

            (a)  Hu's Construction ........................................................................15

            (b)  Plaintiffs' Construction...............................................................18

    B.  CLAIM 22........................................................................................................21

        1.  "mounted" .................................................................................................21

            (a)  Hu's Construction ........................................................................21

            (b)  Plaintiffs' Construction...............................................................22

        2.  "*bearing*"................................................................................................23

            (a)  Hu's Construction ........................................................................23

            (b)  Plaintiffs' Construction...............................................................24

V.      CONCLUSION .................................................................................................25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EASCO HAND TOOLS, INC., ARMSTRONG TOOLS INC., KINGSLEY TOOLS INC., LEA WAY HAND TOOL CORPORATION, AND MATCO TOOLS CORPORATION, | ) ) ) ) ) | Civil Action No. 3:02 CV 1723 (AVC) |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| HU, HOU-FEI, a/k/a BOBBY HU, | ) ) | March 31, 2004 |
| Defendant. | ) ) ) | |

DEFENDANT HU'S *MARKMAN* BRIEF
ON CLAIM CONSTRUCTION

## I.  INTRODUCTION

Pursuant to the Court's December 4, 2003 Scheduling Order, Defendant Hou-Fei Hu ("Hu") submits his proposed claim constructions for the disputed terms of U.S. Patent No. 6,457,387 ("the '387 Patent"). The '387 Patent relates to a reversible ratcheting wrench with a smaller head and improved driving torque. The '387 Patent technology is applicable to different types of reversible ratcheting wrenches, including both socket wrenches and reversible ratcheting box-end type wrenches.

## II.  CLAIM CONSTRUCTION PRINCIPLES

The Court is responsible for construing the terms used in the claims of a patent as a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S.

370 (1996). The Court must construe the disputed terms of the claims at issue as a first step in both infringement and validity analyses. *E.g., Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).

To construe the disputed terms, the Court should begin with the language of the claims. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1341 (Fed. Cir. 2001). This principle is fundamental to claim construction jurisprudence, as it directly flows from the basic structure of a patent—the claims define the scope of the protected invention, while the specification merely teaches one or more <u>examples</u> of how the invention may be implemented. *See* 35 U.S.C. § 112. As the Federal Circuit aptly stated:

> Our case law is clear that an applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention. . . . As we noted long ago: Specifications teach. Claims claim.

*Rexnord*, 274 F.3d at 1344 (internal citations and quotation marks omitted). For this reason, the Federal Circuit recently reaffirmed that "adding limitations to claims not required by the claim terms themselves, or unambiguously required by the specification or prosecution history, is impermissible." *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327 (Fed. Cir. 2001). Thus, claim construction begins with the language of the claims—it does not begin with identifying the scope of the embodiments or examples disclosed in the patent specification. *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002) ("Consulting the written description and prosecution history as a threshold step in the claim construction process, before any effort is made to discern the ordinary and customary meanings attributed to the words themselves, invites a violation of our precedent counseling against importing limitations into the claim.").

2

The claim terms "bear a 'heavy presumption' that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." *Id.* at 1202. The Court may look to dictionaries, treatises, and encyclopedias to establish the ordinary and customary meaning of particular claim terms. *Id.* ("Dictionaries are always available to the court to aid in the task of determining meanings that would have been attributed by those of skill in the relevant art to any disputed terms used by the inventor in the claims."); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996).

Further, "the intrinsic record also must be examined in every case to determine whether the presumption of ordinary and customary meaning is rebutted." *Texas Digital Systems, Inc.*, 308 F.3d at 1204. The intrinsic record includes: (1) the claim language itself; (2) the specification of the patent; and (3) the patent's prosecution history. *Vitronics*, 90 F.3d at 1582. The Federal Circuit has issued specific guidelines to assist courts in properly using the intrinsic record in claim construction. Specifically, the intrinsic record must be consulted to determine: (1) whether "the patentee, acting as his or her own lexicographer, has clearly set forth an explicit definition of the term different from its ordinary meaning," *Texas Digital Systems*, 308 F.3d at 1204; (2) whether "the inventor has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope," *id.*; *see also 3M Innovative Properties Co. v. Avery Denison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003); and (3) "which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor." *Texas Digital Systems*, 308 F.3d at 1203.

Strict adherence to these guidelines for using the intrinsic record is required to avoid improperly importing a limitation from the specification into the claims. The Supreme Court has

3

cautioned that "[i]f we once begin to include elements not mentioned in the claim, in order to limit such claim . . ., we should never know where to stop." *McCarty v. Lehigh Valley R.R.*, 160 U.S. 110, 116 (1895). Similarly, the Federal Circuit has repeatedly cautioned lower courts against improper use of the specification to limit claims. *E.g.*, *E-Pass Tech., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1368 (Fed. Cir. 2003) ("There is, therefore, no basis in the ordinary meaning of the claim terms at issue or in the other claim language to impose industry standard dimensions as the district court has done."); *Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 989-90 (Fed. Cir. 1999) ("[C]laim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invites reference to those sources."). Thus, while it is improper for a court to read a limitation from the specification into the claims, the specification must be reviewed to insure that the customary meaning of the terms controls, and to identify which of the customary meanings are inconsistent and should be rejected. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004); *Texas Digital Sys.*, 308 F.3d at 1203.

With respect to the third enumerated use of the intrinsic record in claim construction, the intrinsic record must be consulted when choosing among dictionary definitions because "[i]ndiscriminate reliance on definitions found in dictionaries can often produce absurd results." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (internal quotations omitted). Where dictionaries provide multiple definitions, the claim term may be construed to encompass all such definitions, provided the definitions are consistent with the use of the words in the "intrinsic record." *Texas Digital Systems, Inc.*, 308 F.3d at 1203. "[I]t is always necessary to review the specification to determine whether the inventor has used any terms in a

4

manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at 1582. In such a situation, "the patent disclosure serves to point away from the improper meanings and toward the proper meaning." *Id.*; *see also Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir. 2003) ("In *Texas Digital*, we noted that the specification may be useful in determining a claim term's ordinary meaning where a dictionary has been consulted but it becomes necessary to choose between multiple definitions.").

Finally, in addition to examining the intrinsic evidence the Court may, in its discretion, receive extrinsic evidence on claim construction, but only for the limited purpose of explaining applicable technical principles. *See Key Pharmaceuticals v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998) ("[T]rial courts generally can hear expert testimony for background and education on the technology implicated by the presented claim construction issues, and trial courts have broad discretion in this regard."). However, extrinsic evidence should not be used "for the purpose of varying or contradicting the terms of the claims." *Markman*, 52 F.3d at 981.

## III. OVERVIEW OF THE TECHNOLOGY AT ISSUE

The inventions claimed in the '387 Patent relate to reversible ratcheting wrenches, such as a socket wrench or a box end wrench, having, *inter alia*, a smaller head and improved driving torque for convenient use in a limited space.[1] Embodiments of the tools claimed in the '387 Patent may have any number of components. One of those components is a gear wheel, which can have teeth disposed on its outer surface.[2] Another of those components is a pawl, which can have one or

---

[1]     A copy of the '387 Patent is attached as Exhibit A.

[2]     Ex. A, *e.g.*, see gear wheel 21 in Figure 2 of the '387 Patent.

more curved portions of teeth disposed on its outer surface.[3]  The interconnection between the pawl teeth and the gear wheel teeth allows the tool to tighten or loosen a fastener when the handle is rotated in one direction and allows the tool to "ratchet" when the handle is rotated in the other direction.  The tool also typically has a switch that allows a user to change the direction in which the tool tightens or loosens, and consequently the direction in which the tool ratchets.

When the switch is turned to a first position, the teeth from the gear wheel engage with one of the teeth portions of the pawl, thereby allowing the gear wheel to ratchet in a first ratcheting direction, while preventing the gear wheel from ratcheting in the second, opposite ratcheting direction.[4]  When the switch is turned to a second position, the other set of pawl teeth are moved into engagement with the teeth of the gear wheel, thereby allowing the gear wheel to ratchet in the second ratcheting direction, while preventing the gear wheel from ratcheting in the first, opposite ratcheting direction.[5]  In a particular embodiment, the teeth portions of the pawl have different centers of curvature, which allow for optimum driving torque.[6]

## IV. CLAIM CONSTRUCTION FOR DISPUTED TERMS OF THE '387 PATENT

Hu's proposed claim construction for the disputed terms of the asserted claims is provided below.  For each asserted claim that contains a disputed term, Hu has quoted the claim in full and highlighted (in gray) the disputed terms to be defined.  Some terms appear in subsequent claims; Hu therefore has not provided a separate discussion for these terms when they appear in the subsequent claims and has not highlighted these terms in the subsequent claims.  A summary of

---

[3]      *Id., e.g.,* see pawl 30 in Figures 2, 2A, 3A, 4A, and 5A of the '387 Patent.

[4]      *See, e.g., id.,* '387 Patent, col. 6, ll. 37-50.

[5]      *Id.* at ll. 51-65.

6

Hu's proposed claim constructions and the support is attached at Exhibit B.

### A.    Claim 17

| '387 Patent, Claim 17 |
| --- |
| 17.  A ratcheting tool comprising:<br><br>a rotatably mounted drive member including a gear wheel having an outer periphery with a plurality of first teeth; and<br><br>a pawl including a first side with a plurality of second teeth facing the fist teeth of the gear wheel and a second side facing away from the gear wheel, with the second teeth of the pawl including a first teeth portion having a first center of curvature and a second teeth portion having a second center of curvature located at a position different from the first center of curvature, with the pawl being movable between a first ratcheting position and a second ratcheting position, wherein the first teeth portion of the pawl is engaged with the fist teeth of the gear wheel for ratcheting in a first direction and the second teeth portion of the pawl is disengaged from the first teeth of the gear wheel when the pawl is in the first ratcheting position, and wherein the second teeth portion of the pawl is engaged with the first teeth of the gear wheel for ratcheting in a second direction opposite to the first direction and the first teeth portion of the pawl is disengaged from the first teeth of the gear wheel when the pawl is in the second ratcheting position. |

---

[6]    *See, e.g., id.* at col. 4, ll. 44-56 and Figure 2A.

### 1. "ratcheting tool"[7]

#### (a)    Hu's Construction

Definition

> The term "ratcheting tool" means "a contrivance held in and worked by the hand for performing or facilitating mechanical operations engaging a toothed wheel with a pawl."

Support for Definition

The phrase "ratcheting tool" has two components—"ratcheting" and "tool." The ordinary and customary meanings of the term "ratchet" are:

> *n.* **1.** a toothed bar with which a pawl engages. **2.** (not in technical use) a pawl or the like used with a ratchet or ratchet wheel. **3.** a mechanism consisting of such a bar or wheel with the pawl. **4.** See **ratchet wheel. 5.** a steady progression up or down: *the upward ratchet of oil prices.* —*v.t., v.i.* **6.** to move by degrees (often *fol.* by *up* or *down*): *to ratchet prices up; Interest rates have been ratcheting downward.*[8]

Definitions 1, 2, and 3 appear to be the only ones that are relevant to the usage of "ratchet" in the

---

[7]    A patent claim is normally divided into three sections: (1) the preamble; (2) the transition; and (3) the body. *Bristol-Meyers-Squibb Co. v. Immunex Corp.*, 86 F. Supp. 2d 447, 450 (D.N.J. 2000). The preamble is that portion of the claim that precedes the word "comprising." *Id.* The phrase "ratcheting tool" is found in the preamble of claim 17. It is sometimes disputed whether the preamble is a limitation of the claim. In *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989), the Federal Circuit held that the preamble phrase "optical waveguide" was a limitation of the claim because the written description indicated that the invention was addressed to solving problems in the area of optical waveguides. *Id.* Similarly, the '387 Patent specification repeatedly indicates that the invention is directed to a ratcheting tool. *See Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376 (Fed. Cir. 2001) (holding that the phrase "correlated set" in the claim preamble "An improved correlated set of iron-type golf clubs" was a limitation of the claim based on the fact that the phrase described the invention and occurred in every claim). Thus, the preamble phrase "ratcheting tool" is a limitation of claim 17. Further, Hu assumes that the parties agree that "ratcheting tool" is a limitation of claim 17 because Plaintiffs offered a construction of the phrase without challenging whether it was a limitation.

[8]    RANDOM HOUSE, *Webster's Unabridged Dictionary* 1602 (2d ed. 2001) (hereinafter "*Webster's*"). A copy of the relevant excerpts is attached as Exhibit C. Where dictionaries provide multiple definitions, the claim term may be construed to encompass all such definitions, so long as

'387 Patent. *See Waner v. Ford Motor Co.*, 331 F.3d 851, 854 (Fed. Cir. 2003) ("The specification and drawings of the '710 patent demonstrate that definition 1 most adequately represents what the inventor intended to claim in his invention."). Based on these three definitions, "ratcheting" means engaging a toothed bar or wheel with a pawl. The specification and prosecution history of the '387 Patent are consistent with this definition.[9]

For example, the '387 Patent teaches, "Referring to FIGS. **1**, **2**, and **6**, a ratcheting tool in accordance with the present invention is designated by **10** and has a handle **11** and a head **12** extended from the handle **11**."[10] The specification further recites, "Rotatably mounted in the head **12** is a drive member **20** having an upper end **22**, a drive column **23** on a lower end thereof, and a gear wheel **21** formed in an intermediate portion thereof. The gear wheel **21** . . . includes teeth **211** formed on an outer periphery thereof."[11] The '387 Patent further teaches:

> A pawl **30** is mounted in the second compartment section **132** and includes a side facing the gear wheel teeth **211**. Referring to FIG. **2A**, the side of the pawl **30** has a plurality of teeth (ten teeth in this embodiment) for engaging with the gear wheel teeth **211**, thereby providing reliable mesh therebetween.[12]

The embodiment disclosed in the specification includes a gear wheel 21 with teeth and a pawl 30 with teeth that mesh with the gear wheel teeth 211. Thus, the embodiment disclosed in the specification engages a toothed wheel with a pawl and is consistent with the ordinary and customary meaning of "ratcheting."

---

all the definitions are consistent with the use of the words in the intrinsic record. *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1203 (Fed. Cir. 2002).

[9]    A copy of the prosecution history of the '387 Patent is attached as Exhibit D.

[10]    Ex. A, '387 Patent, col. 3, l. 66 – col. 4, l. 2.

[11]    *Id.* at col. 4, ll. 16-21.

[12]    *Id.* at ll. 44-49.

The ordinary and customary meanings of the term "tool" are:

> *n.* **1.** an implement, esp. one held in the hand, as a hammer, saw, or file, for performing or facilitating mechanical operations. **2.** any instrument of manual operation. **3.** the cutting or machining part of a lathe, planer, drill, or similar machine. **4.** the machine itself; a machine tool. **5.** anything used as a means of accomplishing a task or purpose: *Education is a tool for success.* **6.** a person manipulated by another for the latter's own ends; cat's-paw. **7.** the design or ornament impressed upon the cover of a book. **8.** *Underworld Slang.* **a.** a pistol or gun. **b.** a pickpocket. **9.** *Slang (vulgar).* penis. —*v.t.* **10.** to work or shape with a tool. **11.** to work decoratively with a hand tool. **12.** to ornament (the cover of a book) with a bookbinder's tool. **13.** to drive (a vehicle): *He tooled the car along the treacherous path.* **14.** to equip with tools or machinery. —*v.i.* **15.** to work with a tool. **16.** to drive or ride in a vehicle: *tooling along the freeway.* **17. tool up,** to install machinery designed for performing a particular job: *manufacturers tooling up for production.* . . .

> —**Syn. 1.** TOOL, IMPLEMENT, INSTRUMENT, UTENSIL refer to contrivances for doing work. A TOOL is a contrivance held in and worked by the hand, for assisting the work of (especially) mechanics or laborers: *a carpenter's tools.* An IMPLEMENT is any tool or contrivance designed or used for a particular purpose: *agricultural implements.* An INSTRUMENT is anything used in doing a certain work or producing a certain result, especially such as requires delicacy, accuracy, or precision: *surgical or musical instruments.* A UTENSIL is especially an article for domestic use: *kitchen utensils.* When used figuratively of human agency, TOOL is generally used in a contemptuous sense; INSTRUMENT, in a neutral or good sense: *a tool of unscrupulous men; an instrument of Providence.*[13]

Only definition 1 is pertinent to the usage of "tool" in the '387 Patent. In particular, as explained in the addendum describing synonyms quoted above, the term "tool" is a contrivance held in and worked by the hand.[14] That definition is the only one that is consistent with the usage of tool in the specification of the '387 Patent. Definitions 2 and 5, although potentially pertinent to the subject matter of the '387 Patent, are ultimately inconsistent with the '387 Patent specification.

---

[13]    Ex. C, *Webster's* at 1995.

[14]    *Webster's Third New International Dictionary of the English Language Unabridged* (2002) (the pertinent definition of "tool" is "**1 a** an instrument (as a hammer or saw) used or worked by hand : an instrument used by a handicraftsman or laborer in his work : IMPLEMENT"). A copy of the relevant portion of this dictionary is included as Exhibit E.

Where more than one dictionary definition of a term may be proper, "the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor." *Texas Digital*, 308 F.3d at 1203. "If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings." *Id.* However, "the intrinsic record may show that the specification uses the words in a manner clearly inconsistent with the ordinary meaning reflected, for example, in a dictionary definition. In such a case, the inconsistent dictionary definition must be rejected." *Id.* at 1204.

For example, in *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998), the Federal Circuit affirmed the trial court's construction of "when" based on how that term was used in the specification. Although the term could have meant in the same instant as, during, or even after the time that, the court excluded some of these definitions because the specification discussed a sensor that required detection very soon after an event, thereby excluding dictionary definitions allowing detection to occur an appreciable amount of time after the event. *Id.* at 1250-53.

Similarly, the '387 Patent specification uses the term "tool" to refer to a wrench, consistent with definition 1 and inconsistent with definitions 2 and 5. For example, the specification begins, "The present invention relates to a reversible ratcheting tool having a smaller head and improved driving torque for convenient use in a limited space."[15] Further, the Summary of the Invention of the '387 Patent states that "[i]t is a primary object of the present invention to provide a reversible ratcheting tool with a small head while providing improved driving torque for convenient use in a

---

[15]    Ex. A, '387 Patent, col. 1, ll. 6-9.

11

limited space."[16]   Thus, the benefit that the invention of the '387 Patent seeks to provide makes sense in the context of handheld devices, such as wrenches or sockets, but does not make sense in the context of large machinery. *See Renishaw*, 158 F.3d at 1251 ("Replete with references that indicate that the patentee was preeminently concerned with generating a trigger signal as soon as possible after contact, the written description lends precision to the term 'when.'").

Further support for Hu's proposed construction is found in the Background of the '387 Patent, which states that "[a] wide variety of ratcheting tools have heretofore been disclosed."[17] The disclosure recites a number of patents *all of which disclose handheld wrenches or sockets.*[18] The '387 Patent then states that "[m]ost of the above-mentioned conventional *ratcheting tools* fail to provide high torque operation . . . ."[19]   Thus, the fact that Hu described the prior art wrench patents as "ratcheting tools" supports Hu's construction.

Additionally, the Detailed Description of the Preferred Embodiment begins, "Referring to FIGS. 1, 2, and 6, a ratcheting tool in accordance with the present invention is designated by 10 and has a handle 11 and a head 12 extended from the handle 11."[20]   The Figures of the '387 Patent disclose a reversible ratcheting wrench.[21]   Further, the specification always uses the term tool in the sense of referring to a handheld device.

The prosecution history of the '387 Patent also indicates that the term "tool" is limited to a handheld contrivance.  A patent examiner is required to determine the scope of the claims prior to

---

[16]     *Id.* at col. 2, ll. 17-20.

[17]     *Id.* at col. 1, ll. 11-12.

[18]     *Id.*

[19]     *Id.* at col. 1, ll. 20-23 (emphasis added).

[20]     *Id.* at col. 3, l. 66 – col. 4, l. 2.

performing a prior art search. As the *Manual of Patent Examining Procedure* ("MPEP") spells out

for examiners:

> The breadth of the claims in the application should always be carefully noted; that
> is, the examiner should be fully aware of what the claims do *not* call for, as well as
> what they do require. During patent examination, the claims are given the broadest
> reasonable interpretation consistent with the specification.[22]

The MPEP then requires the examiner to "note every class and subclass under the U.S. Patent

Classification system and other organized systems of literature that may have material pertinent to

the subject matter as claimed."[23]  In this case, all of the subclasses searched by the examiner are for

ratcheting wrenches. In particular, the examiner searched in subclasses 60, 61, 62, 63, 63.1, and

63.2 within class 81.[24]  The description of class 81 states, "This class is limited to hand tools,

except in the subclasses noted in Subclass References to the Current Class, below."[25]  Further,

subclass 60 has the following description: "Wrench or screwdriver wherein the clutching elements

include a catch, dog, pawl or similar detent means, so arranged that movement of the handle in one

direction will drive the head while movement in the opposite direction permits relative rotation of

the head and handle."[26]  Subclasses 61, 62, 63, 63.1 and 63.2 are all within subclass 60. Thus, the

examiner only searched for art pertaining to ratcheting wrenches and screwdrivers, demonstrating

that the term "tool" is limited to handheld contrivances as indicated by the specification of the '387

---

[21]     *Id.*; *see also, e.g.*, Figures 1 and 2.

[22]     *Manual of Patent Examining Procedure* § 904.01 (8th ed. 2001). A copy of the relevant
portions is attached as Exhibit F

[23]     *Id.* § 904.02(a).

[24]     Ex. A, see "Field of Search" on front page of patent.

[25]     *Manual of Patent Classification* 81-1 (2000). A copy of the relevant portions is attached as
Exhibit G.

[26]     *Id.* at 81-17.

13

Patent and by definition 1.

Thus, definitions 2 and 5 are inconsistent with the usage in the specification. For example, the definitions include, "**2.** any instrument of manual operation. . . . **5.** anything used as a means of accomplishing a task or purpose: *Education is a tool for success*."[27] These definitions of "tool" could include large machinery, oilfield tools, or other devices not even remotely envisioned by the inventor. This case is analogous to *Renishaw* in that the alternative definitions must be rejected as inconsistent with the specification. Therefore, the term "tool" is defined to mean a contrivance held in and worked by the hand for performing or facilitating mechanical operations.

Combining the plain and ordinary meanings of "ratcheting" and "tool," a "ratcheting tool" is "a contrivance held in and worked by the hand for performing or facilitating mechanical operations engaging a toothed wheel with a pawl." Hu respectfully requests that this definition be adopted.

### (b)    Plaintiffs' Construction

Plaintiffs offered the following construction of the phrase "ratcheting tool": "A tool having a mechanism that consists of a bar or wheel having inclined teeth with which a pawl interacts so that motion can be imparted to the wheel or bar."[28] As noted above, the phrase "ratcheting tool" consists of the terms "ratcheting" and "tool." Plaintiffs chose to construe only the term "ratcheting."[29] Plaintiffs' definition of "ratcheting" is longer and more difficult to comprehend than Hu's, which states, "engaging a toothed wheel with a pawl." Thus, Hu's definition is simpler

---

[27]     Ex. C, *Webster's* at 1995.

[28]     *See* Parties' Joint Claim Construction Statement, pp. 1-2, Item 1, a copy of which is attached as Exhibit H.

[29]     *Id.*

and easier for the jury to understand. Because Hu's definition is simpler and is consistent with the specification, Hu's definition should be adopted.

With respect to "tool," however, Hu's proffered construction is the only construction available. Because Plaintiffs failed to offer a construction of "tool" as required by the Court's Scheduling Order, Plaintiffs cannot submit a construction of "tool" unless they "either obtain the consent of all other parties or file a motion requesting permission from the court for such amendment, modification, or new construction and establish to the court that good cause exists for entry of the same." *Easco v Hu*, No. 3:02 CV 1723, p. 1, Item 2(a) (D. Conn. Dec. 4, 2003) (Scheduling Order). Therefore, Plaintiffs are barred from submitting or suggesting an alternative construction of "tool." Consequently, Hu respectfully requests that his construction of "ratcheting tool" be adopted.

### 2. "drive member"

#### (a)    Hu's Construction

Definition.

> The phrase "drive member" means "a constituent part of any structural unit or composite whole that causes something to move by force or compulsion in a direction."

Support for Definition.

The phrase "drive member" includes the terms "drive" and "member." The ordinary and customary meanings of "drive" are:

> —*v.t.* **1.** to send, expel, or otherwise cause to move by force or compulsion: *to drive away the flies; to drive back an attacking army; to drive a person to desperation.* **2.** to cause and guide the movement of (a vehicle, an animal, etc.): *to drive a car; to drive a mule.* **3.** to convey in a vehicle: *She drove them to the station.* **4.** to force to work or act: *He drove the workers until they collapsed.* **5.** to impel; constrain; urge; compel. **6.** to carry (business, an agreement, etc.) vigorously

15

through: *He drove a hard bargain.* **7.** to keep (machinery) going. **8.** *Baseball.* **a.** to cause the advance of (a base runner) by a base hit or sacrifice fly: *He drove him home with a scratch single.* **b.** to cause (a run) to be scored by a base hit or sacrifice fly: *He drove in two runs.* **9.** *Golf.* to hit (a golf ball), esp. from the tee, as with a driver or driving iron: *She drove the ball within ten feet of the pin.* **10.** *Sports.* **a.** to hit or propel (a ball, puck, shuttlecock, etc.) very hard. **b.** to kick (a ball) with much force. **11.** *Hunting.* **a.** to chase (game). **b.** to search (a district) for game. **12.** to float (logs) down a river or stream. **13.** (in mining, construction, etc.) to excavate (a mine or tunnel heading).

—*v.i.* **14.** to cause and guide the movement of a vehicle or animal, esp. to operate an automobile. **15.** to go or travel in a driven vehicle: *He drives to work with me.* **16.** *Golf.* to hit a golf ball, esp. from the tee, as with a driver or driving iron: *He drove long and straight throughout the match.* **17.** to strive vigorously toward a goal or objective; to work, play, or try wholeheartedly and with determination. **18.** to go along before an impelling force; be impelled: *The ship drove before the wind.* **19.** to rush or dash violently. **20. drive at,** to attempt or intend to convey; allude to; suggest: *What are you driving at?* **21. let drive,** to aim a blow or missile at; attack: *He let drive at his pursuers.*

—*n.* **22.** The act of driving. **23.** A trip in a vehicle, esp. a short pleasure trip: *a Sunday drive in the country.* **24.** an impelling along, as of game, cattle, or floating logs, in a particular direction. **25.** the animals, logs, etc., thus driven. **26.** *Psychol.* an inner urge that stimulates activity or inhibition; a basic or instinctive need: *the hunger drive; sex drive.* **27.** a vigorous onset or onward course toward a goal or objective: *the drive toward the goal line.* **28.** a strong military offensive. **29.** a united effort to accomplish some specific purpose, esp. to raise money, as for a charity. **30.** energy and initiative: *a person with great drive.* **31.** vigorous pressure or effort, as in business. **32.** a road for vehicles, esp. a scenic one, as in or along a park, or a short one, as an approach to a house. **33.** *Mach.* a driving mechanism, as of an automobile: *gear drive; chain drive.* **34.** *Auto.* the point or points of power application to the roadway: *front-wheel drive, four-wheel drive.* **35.** *Sports* **a.** an act or instance of driving a ball, puck, shuttlecock, or the like. **b.** the flight of such a ball, puck, shuttlecock, or the like, that has been driven with much force. **36.** *Golf.* a shot, esp. with a driver or driving iron from the tee, that is intended to carry a great distance. **37.** a hunt in which game is driven toward stationary hunters. **38.** *Electronics.* excitation (def. 5).

—*adj.* **39.** noting or pertaining to a part of a machine or vehicle used for its propulsion.[30]

The pertinent definitions are 1 and 2. The remaining definitions are outside the context of the '387

Patent. The term "drive" as used in the phrase "drive member" is an adjective. Definition 39,

16

however, is confined to the context of a self-propelled machine or vehicle, which is outside the scope of the '387 Patent because the '387 Patent is directed to wrenches.

Definitions 1 and 2 are consistent with the use of the term "drive" in the '387 Patent specification. In particular, the drive member disclosed in the '387 Patent is adapted to drive fasteners. The '387 Patent teaches, "Thus, the teeth **31** of the pawl **30** is forced to engage with the teeth **211** of the gear wheel **21** of the drive member **20**, best shown in FIG. **6**. The ratcheting tool is now in a status for driving a socket (not shown) or the like clockwise."[31]  The embodiment described in the specification is adapted to cause a fastener, via the socket, to move by force or compulsion in a direction (*i.e*, tightening or loosening). Definitions 1 and 2 are consistent with the specification of the '387 Patent. Thus, the ordinary meaning of "drive" as used in the '387 Patent means to cause to move by force or compulsion and/or to guide the movement of.

The ordinary and customary meanings of "member" are:

> *n*. **1.** a person, animal, plant, group, etc., that is part of a society, party, community, taxon, or other body. **2.** *Govt*. **a.** a member of Congress, esp. of the House of Representatives. **b.** a member of the British Parliament, esp. of the House of Commons. **c.** any member of a legislative body. **3.** a part or organ of an animal body; a limb, as a leg, arm, or wing. **4.** *Bot*. a structural entity of a plant body. **5.** the penis. **6.** a constituent part of any structural or composite whole, as a subordinate architectural feature of a building. **7.** *Math*. **a.** either side of an equation. **b.** an element of a set. **8.** *Geol*. a stratigraphic unit recognized within a formation, and mapped as such. —*adj*. **9.** being a member of or having membership in an association, organization, etc.: *member countries of the United Nations*.[32]

---

[30]    Ex. C, *Webster's* at 597.

[31]    Ex. A, '387 Patent, col. 6, ll. 4-6.

[32]    *Id* at 1198-99; *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002) ("'[M]ember,' as defined by common and technical dictionaries, refers to a 'structural unit such as a . . . beam or tie, or a combination of these' or to a 'distinct part of a whole.'") (citations omitted) (second alteration in original).

The pertinent definition is 6, which defines "member" as a constituent part of any structural or composite whole. The remaining definitions are clearly outside the scope of the usage of "member" in the '387 Patent. Thus, the ordinary meaning of "member" is a constituent part of any structural or composite whole.

Combining these meanings, the phrase "drive member" is a "structural unit or part that urges, pushes, or forces something to move in a direction." This ordinary meaning of the phrase drive member is consistent with the specification of the '387 Patent. For example, the specification states, with reference to Figures 1, 2, and 6, "Rotatably mounted in the head **12** is a drive member **20** having an upper end **22**, a drive column **23** on a lower end thereof, and a gear wheel **21** formed in an intermediate portion thereof."[33] The drive member 20 depicted in Figures 2 and 6 is a structural unit that urges, pushes, or forces fasteners to move in a direction (*i.e.*, to fasten or unfasten as described above). Thus, the specification of the '387 Patent is consistent with the ordinary and customary meaning of the phrase "drive member." Hu neither explicitly defined these terms in the intrinsic record, nor clearly disavowed any scope for these terms in the intrinsic record. Thus, Hu respectfully requests that the ordinary and customary meaning of the phrase "drive member" should be adopted.

### (b)    Plaintiffs' Construction

Plaintiffs offer the following definition of "drive member": "A shaft or shaft-like structure extended beyond the compartment."[34] Plaintiffs' proffered construction ignores the claim construction framework and attempts to read a limitation from the specification into the claims.

---

[33]    Ex. A, '387 Patent, col. 4, ll. 16-19.

[34]    Ex. H, Parties' Joint Claim Construction Statement, p. 2, Item 3.

No ordinary meaning of the terms "drive" and "member" indicates a "shaft or shaft-like" structure. Similarly, no ordinary meaning of "drive" or "member" could possibly indicate a structure "extended beyond the compartment." Thus, Plaintiffs must be arguing that the ordinary and customary meaning of "drive" and "member" do not apply. To do so, Plaintiffs must overcome the heavy presumption that the ordinary and customary meaning does apply. *Texas Digital*, 308 F. 3d at 1202. Plaintiffs cannot meet this heavy burden because Plaintiffs cannot show that the intrinsic record evidences any express definition of "drive" or "member" or an express disclaimer of the plain and ordinary meaning of "drive" or "member."

Plaintiffs are attempting to import a limitation from the specification into the claims—a practice long condemned by the Federal Circuit. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("[T]his court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."); *E-Pass Tech., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1368 (Fed. Cir. 2003) ("There is, therefore, no basis in the ordinary meaning of the claim terms at issue or in the other claim language to impose industry standard dimensions as the district court has done."); *Texas Digital Systems*, 308 F.3d at 1205 (cautioning against violating "our proscription of not reading limitations from the specification into the claims"); *Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 989-90 (Fed. Cir. 1999) ("[C]laim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invites reference to those sources.").

19

Also, Plaintiffs' proffered construction would violate the doctrine of claim differentiation.[35] Specifically, where a narrow construction of a claim term would render a dependent claim superfluous, a presumption arises that the claim term has a broader meaning than that provided in the dependent claim. *Comark Communications*, 156 F.3d at 1187.[36]  "The presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question [*i.e.*, the limitation in the dependent claim] is not found in the independent claim." *Id.*  "In such a setting, where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest." *Liebel-Flarsheim*, 358 F.3d at 910.

Applying these principles, claim 18 recites: "The ratcheting tool as claimed in claim 17, with the drive member including a drive column for releasably engaging with a socket."  As described in the '387 Patent, drive column 23 is a shaft or shaft-like structure extending beyond the compartment 13.  Therefore, if the phrase "drive member" meant a shaft or shaft-like structure extending beyond the compartment (as argued by Plaintiffs), claim 18 would arguably have the same scope as claim 17.  At a minimum, claim 18 would be redundant in view of the limitations of claim 17.  Consequently, a presumption arises that the term "drive member" in claim 18 is not limited to the drive column of claim 18 and thus not limited to Plaintiffs' construction. *Liebel-*

---

[35]     The doctrine of claim differentiation is a specific application of the general principle that, in construing claim language in one claim, due consideration must be given to language in other claims. CHISUM ON PATENTS, Vol. 5A, § 18.03[6] (2003).  The doctrine embodies the common sense notion that ordinarily language of a first claim should not be interpreted so as to make the language of another claim, such as a claim dependent on the first claim, identical in scope. *Id.*

[36]     Claims can either be "independent" or "dependent." *Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 1999 WL 66537 * 9 (D. Conn. Feb. 3, 1999).  An "independent claim," such as claim 17 in the '387 Patent, does not refer to any other claim of the patent. *Id.*  A "dependent claim," such as claim 18 of the '387 Patent, refers to at least one other preceding claim. *Id.*

*Flarsheim*, 358 F.3d at 909-10; *Comark Communications, Inc.*, 156 F.3d at 1187. Plaintiffs cannot overcome this presumption. Because Plaintiffs' proffered construction of "drive member" violates multiple claim construction principles, Plaintiffs' construction must be rejected.

### B. Claim 22

<table>
<tr><td>

**'387 Patent, Claim 22**

---

22. The ratcheting tool as claimed in claim 17, with the pawl mounted in a compartment section defined by a wall, with the pawl being moveable in a radial direction relative to the drive member, with the pawl bearing against a first point of the wall when the pawl is in the first ratcheting position and bearing against a second point of the wall when the pawl is in the second ratcheting position, with the second point being spaced from the first point.

</td></tr>
</table>

### 1. "mounted"

#### (a) Hu's Construction

Definition.

The term "mounted" means "put into position for use."

Support for Definition.

The ordinary meanings of the term "mounted" are:

> *adj.* **1.** seated or riding on a horse or other animal. **2.** serving on horseback or on some special mount, as soldiers or police. **3.** *Mil.* (formerly) permanently equipped with horses or vehicles for transport. Cf. **mobile** (def. 3). **4.** having or set in a mounting: *mounted gems*. **5.** put into position for use, as guns.[37]

Only definition 5 is pertinent to the usage of the term "mounted" in the '387 Patent specification. Thus, "mounted" means put into position for use.

Hu neither explicitly defined this term in the intrinsic record, nor clearly disavowed any scope for this term in the intrinsic record. In fact, the specification is consistent with this

---

[37]     Ex. C, *Webster's* at 1256.

construction.  For example, the specification teaches that "[a] pawl **30** is mounted in the second compartment section **132** and includes a side facing the gear wheel teeth **211**."[38]  The pawl 30, as described in the specification, is put into position for use in the second compartment section 132. Thus, the ordinary and customary meaning of the term "mounted" should be adopted.

**(b)     Plaintiffs' Construction**

Plaintiffs offer the following construction of "mounted": "Attached to."[39]  Although not found in the dictionary cited above, Plaintiffs have told Hu that their proffered definition is an alternative dictionary definition.   The specification, however, is inconsistent with Plaintiffs' definition of mounted.  As noted above, the specification teaches that the pawl 30 is mounted in the second compartment section, yet the specification never teaches that the pawl 30 is "attached to" anything.  In particular, as shown in the Figures 4A and 5A of the '387 Patent specification, the pawl 30 is free to move back and forth in the second compartment section.  The pawl 30 cannot be "attached to" the second compartment section.  Thus, Plaintiffs' definition is inconsistent with the specification and would exclude the preferred embodiment, which is a violation of a cardinal rule of claim construction.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("[An interpretation excluding a preferred embodiment from the claim] is rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case.").  Accordingly, Hu respectfully suggests that Plaintiffs' construction be rejected.

---

[38]     Ex. A, '387 Patent, col. 4, ll. 44-45.

[39]     Ex. H, Parties' Joint Claim Construction Statement, p. 3, Item 16.

22

### 2. "bearing"

#### (a)   Hu's Construction

<u>Definition</u>:

The term "bearing" means "pressing or pushing against."

<u>Support for Definition</u>:

The term "bearing" is a form of the verb "to bear."  The ordinary and customary meanings

of the term "bear" are:

—*v.t.*  **1.** to hold up; support: *to bear the weight of the roof.*  **2.** to hold or remain firm under (a load): *The roof will not bear the strain of his weight.*  **3.** to bring forth (young); give birth to: *to bear a child.*  **4.** to produce by natural growth: *a tree that bears fruit.*  **5.** to hold up under; be capable of: *His claim doesn't bear close examination.*  **6.** to press or push against: *The crowd was borne back by the police.*  **7.** to hold or carry (oneself, one's body, one's head, etc.): *to bear oneself erectly.*  **8.** to conduct (oneself): *to bear oneself bravely.*  **9.** to suffer; endure; undergo: *to bear the blame.*  **10.** to sustain without yielding or suffering injury; tolerate (usually used in negative constructions, unless qualified): *I can't bear your nagging.  I can hardly bear to see her suffering so.*  **11.** to be fit for or worthy of: *It doesn't bear repeating.*  **12.** to carry; bring: *to bear gifts.*  **13.** to carry in the mind or heart: *to bear love; to bear malice.*  **14.** to transmit or spread (gossip, tales, etc.).  **15.** to render; afford; give: *to bear witness; to bear testimony.*  **16.** to lead; guide; take: *They bore him home.*  **17.** to have and be entitled to: *to bear title.*  **18.** to exhibit; show: *to bear a resemblance.*  **19.** to accept or have, as an obligation: *to bear responsibility; to bear the cost.*  **20.** to stand in (a relation or ratio); have or show correlatively: *the relation that price bears to profit.*  **21.** to possess, as a quality or characteristic; have in or on: *to bear traces; to bear an inscription.*  **22.** to have and use; exercise: *to bear authority; to bear sway.*  —*v.i.*  **23.** to tend in a course or direction; move; go: *to bear west; to bear left at the fork in the road.*  **24.** to be located or situated: *The lighthouse bears due north.*  **25.** to bring forth young or fruit: *Next year the tree will bear.*  **26. bear down, a.** to press or weigh down.  **b.** to strive harder; intensify one's efforts: *We can't hope to finish unless everyone bears down.*  **c.** *Naut.* to approach from windward, as a ship: *The cutter was bearing down the channel at twelve knots.*  **27. bear down on** or **upon, a.** to press or weigh down on.  **b.** to strive toward.  **c.** to approach something rapidly.  **d.** *Naut.* to approach (another vessel) from windward: *The sloop bore down on us, narrowly missing our stern.*  **28. bear off, a.** *Naut.* to keep (a boat) from touching or rubbing against a dock, another boat, etc.  **b.** *Naut.* to steer away.  **c.** *Backgammon.* to remove the stones from the board

23

after they are all home.  **29. bear on** or **upon,** to affect, relate to, or have connection with; be relevant to: *This information may bear on the case.*  **30. bear out,** to substantiate; confirm: *The facts bear me out.*  **31. bear up,** to endure; face hardship bravely: *It is inspiring to see them bearing up so well.*  **32. bear with,** to be patient or forbearing with: *Please bear with me until I finish the story.*  **33. bring to bear,** to concentrate on with a specific purpose: *Pressure was brought to bear on those with overdue accounts.* [40]

Only definition 6 is pertinent to the usage of "bearing" in the '387 Patent.  Thus, "bearing" means "pressing or pushing against."  Hu neither explicitly defined this term in the intrinsic record, nor clearly disavowed any scope for this term in the intrinsic record.  In fact, the '387 Patent specification supports Hu's construction.  For example, the specification teaches that, depending on whether the tool is in the first or second ratcheting position, "the pawl **30** bears against a point 'G' of a left wall portion defining the second compartment section **132** [as shown in Figure 4A],"[41] or "the pawl **30** bears against a point 'H' of a right wall portion defining the second compartment section **132** [as shown in Figure 5A]."[42]  Thus, the cited Figures and the quoted passages show that the pawl is "pressing or pushing against" a portion of the compartment **132**.  Accordingly, Hu respectfully requests that the Court adopt the ordinary and customary meaning of "bearing."

### (b)    Plaintiffs' Construction

Plaintiffs offer the following construction of "bearing": "Touching sufficient to create a reactive force."[43]    Although Plaintiffs claim that their proffered construction is a standard dictionary definition, it is unclear whether Plaintiffs' construction is consistent with the specification because the phrase "reactive force" is ambiguous.  For example, what is a "reactive

---

[40]      Ex. C, *Webster's* at 182.

[41]      Ex. A, '387 Patent, col. 6, ll. 17-19    .

[42]      *Id.* at col. 6, l. 66 – col. 7, l. 1.

[43]      Ex. H, Parties Joint Claim Construction Statement, p. 4, Item 23.

force," and more importantly will the jury understand what is meant by "reactive force"? Simply put, Hu's construction is consistent with the specification and will be more easily understood by the jury. Thus, Hu respectfully requests that Plaintiffs' construction be rejected.

## V. CONCLUSION

Accordingly, Hu respectfully requests that the Court adopt Hu's proposed claim constructions, as set forth in the Proposed Order of Claim Construction submitted concurrently herewith.

25

Respectfully submitted,

By:_____

Jonathan M. Pierce
Federal Bar No. ct24417
Michael F. Heim, Esq.
Federal Bar No. ct22416
CONLEY ROSE, P.C.
7100 JP Morgan Chase Tower
Houston, Texas 77002-2912
Telephone: (713) 238-8000
Facsimile: (713) 238-8008
E-mail: jpierce@conleyrose.com
E-mail: mheim@conleyrose.com

J. Hoke Peacock III
Federal Bar No. ct24230
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 653-7897
E-mail: tpeacock@susmangodfrey.com

David B. Zabel, Esq.
Federal Bar No. ct01382
COHEN AND WOLF, P.C.
1115 Broad Street
Bridgeport, Connecticut 06604
Telephone: (203) 337-4255
Facsimile: (203) 394-9901
E-mail: dzabel@cohenandwolf.com

**Attorneys for Defendant Hou-Fei Hu**

26

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of *Defendant Hu's* Markman *Brief on Claim Construction* was delivered to all known counsel of record, as follows, on the 31st day of March, 2004, as follows addressed to:

> ***Via First Class Mail***
> Francis H. Morrison
> Matthew J. Becker
> Day, Berry & Howard, LLP
> CityPlace I
> Hartford, Connecticut 06103-3499
>
> ***Via First Class Mail***
> Mark C. Dukes
> Lloyd G. Farr
> Nelson Mullins Riley & Scarborough, LLP
> Keenan Building, Third Floor
> 1330 Lady Street
> P O Box 11070 (29211)
> Columbia, SC 29201

118492v1

27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

EASCO HAND TOOLS, INC.,                    )
ARMSTRONG TOOLS INC., KINGSLEY             )
TOOLS INC., LEA WAY HAND TOOL              )    Civil Action No. 3:02 CV 1723 (AVC)
CORPORATION, AND MATCO TOOLS               )
CORPORATION,                               )
                                           )
Plaintiffs,                                )
                                           )
            vs.                            )
                                           )
HU, HOU-FEI, a/k/a BOBBY HU,               )
                                           )
Defendant.                                 )
_____)

---

### *MARKMAN* CLAIM CONSTRUCTION ORDER

---

Upon consideration of the claims, the specification, and the prosecution history as well as the Memoranda of Law and exhibits and the argument of counsel as to the proper construction of the disputed terms of U.S. Patent No. 6,457,387 (the '387 Patent), the Court is of the opinion that the following claim constructions are the proper meanings of the identified terms and that the Jury should be so instructed. It is therefore Ordered:

1.    The phrase "ratcheting tool" in the claims of the '387 Patent means "a contrivance held in and worked by the hand for performing or facilitating mechanical operations engaging a toothed wheel with a pawl."

2.    The phrase "drive member" in the claims of the '387 Patent means "a constituent part of any structural or composite whole that causes something to move by force or

compulsion in a direction."

3.    The term "mounted" in the claims of the '387 Patent means "put into position for use."

4.    The term "bearing" in the claims of the '387 Patent means "pressing or pushing against."

Signed this _____ day of _____, 2004

_____
                    United States District Judge

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

EASCO HAND TOOLS, INC.,                    )
ARMSTRONG TOOLS INC., KINGSLEY             )
TOOLS INC., LEA WAY HAND TOOL              )    Civil Action No. 3:02 CV 1723 (AVC)
CORPORATION, AND MATCO TOOLS              )
CORPORATION,                               )
                                           )
Plaintiffs,                                )
                                           )
        vs.                                )
                                           )
HU, HOU-FEI, a/k/a BOBBY HU,               )
                                           )
Defendant.                                 )
_____)

**EXHIBIT LIST TO DEFENDANT HU'S**
***MARKMAN* BRIEF ON CLAIM CONSTRUCTION**

Exhibit A -    Copy of U.S. Patent No. 6,457,387.

Exhibit B -    Summary of Hu's Proposed Constructions and Supporting Materials.

Exhibit C -    Excerpts from RANDOM HOUSE *Webster's Unabridged Dictionary* (2d Ed. 2001).

Exhibit D -    Copy of prosecution history (*i.e.*, intrinsic record) of U.S. Patent No. 6,457,387.

Exhibit E -    Excerpts from *Webster's Third New International Dictionary of The English
               Language Unabridged* (2002).

Exhibit F -    Excerpts from *Manual of Patent Classification* (2000).

Exhibit G -    Excerpts from *Manual of Patent Examining Procedure* (8th Ed. 2001).

Exhibit H -    Parties' Joint Claim Construction Statement.