**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| EASCO HAND TOOLS, INC., | : | CIVIL ACTION NO. 3:02 CV1723 (AVC) |
| ARMSTRONG TOOLS, INC., | : | Consolidated with Civil Action No. 3:02 CV |
| KINGSLEY TOOLS, INC., LEA WAY | : | 1747 (AVC) |
| HAND TOOL CORPORATION and | : | |
| MATCO TOOLS CORPORATION | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| HU, HOU-FEI a/k/a BOBBY HU | : | |
| | : | |
| Defendant. | : | April 30, 2004 |

**PLAINTIFFS' CLAIM CONSTRUCTION MEMORANDUM OF LAW**

# TABLE OF CONTENTS

Page

INTRODUCTION AND TECHNICAL BACKGROUND TO THE PATENT ........................... 1

THE '387 PATENT AND ITS CLAIMS ................................................................................ 4

ARGUMENT ......................................................................................................................... 5

I.     THE LAW OF CLAIM CONSTRUCTION  PROVIDES THAT THE
       ORDINARY AND CUSTOMARY MEANING OF CLAIM TERMS TO ONE
       SKILLED IN THE ART IS FOUND IN THE INTRINSIC EVIDENCE ........................ 5

       A.     The Patent Claims .................................................................................................. 6

       B.     The Patent Specification ........................................................................................ 8

       C.     The Prosecution History And Cited Prior Art ...................................................... 10

II.    "RATCHETING TOOL" ........................................................................................................ 11

       A.     Easco's Proposed Construction Reflects The Ordinary And Customary
              Meaning Of The Term To One Skilled In The Art And Is The Correct
              Construction Based On The Intrinsic Evidence .................................................... 11

       B.     Hu's Proposed Construction Is Not Supported By The Intrinsic Evidence .......... 12

III.   "DRIVE MEMBER" ............................................................................................................. 17

       A.     The Intrinsic Evidence Supports Easco's Construction ........................................ 18

              1.     The Claim Language ..................................................................................... 18

                     a.     "Drive" means a shaft that turns a socket ................................... 18

                     b.     "Member" also means shaft or column........................................ 19

              2.     The Patent Specification ............................................................................... 20

                     a.     The Specification Consistently Refers to "Drive Member"
                            as a Shaft or Shaft-Like Structure Extending Beyond the
                            Compartment ............................................................................... 20

                     b.     The Proper Definition of "Drive Member" Does Not
                            "Import" Limitations from the Specification ............................... 24

              3.     The Prosecution History And Cited Prior Art Support Easco's
                     Proposed Construction .................................................................................. 28

       B.     Claim Differentiation Principles Do Not Change The Proper Construction
              Of "Drive Member" .............................................................................................. 30

       C.     Hu's Proposed Construction Of "Drive Member" Requires The Court To
              Define Structural Limitations From The Specification As A Matter Of
              Law ........................................................................................................................ 31

**TABLE OF CONTENTS**
**(continued)**

Page

1.    Drive Member Cannot Be Defined Solely According To Its Function ................................................................................. 32

2.    Courts Defining "Member" Identify Structural Characteristics ............... 33

IV.    "MOUNTED" ................................................................................. 35

A.    The Claim Language And Specification Utilize "Mounted" As Meaning "Attached To Or "Held In Position" .................................................. 35

B.    Hu's Proposed Construction Renders "Mounted" Superfluous .......................... 38

V.    "BEARING" ................................................................................. 39

A.    The Intrinsic Evidence Discloses A Reactive Force Created When the Pawl "Bears" Against A Point ............................................................ 39

B.    Hu Ignores The Intrinsic Evidence And Proposes A Vague And Ambiguous Construction ................................................................... 39

VI.    CONCLUSION ................................................................................. 40

# TABLE OF AUTHORITIES

## CASES

*AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239 (Fed. Cir. 2001)............................... 7, 8, 13, 18

*Abbot Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343 (Fed. Cir. 2003) ............................... 18

*Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308 (Fed. Cir. 1999)................................................... 32

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003).......................... 21

*Andersen Corp. v. Fiber Composites, LLC*, No. 00-2548 (RHK/AJB), 2002 U.S. Dist. LEXIS 6233 (D. Minn. Apr. 9, 2002)........................................................................................... 34

*Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364 (Fed. Cir. 2003)........................................ 19

*Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042 (Fed. Cir. 2000) .............................. 10

*Bausch & Lomb, Inc. v. Moria S.A.*, 222 F. Supp. 2d 616 (E.D. Pa. 2002)................................. 34

*Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258 (Fed. Cir. 2001) ......................................................................................................................... 7

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002). ...............6, 20, 21, 29, 34

*Colassi v. Cybex Int'l, Inc.*, No. 02-11909-RWZ, 2004 U.S. Dist. LEXIS 2950 (D. Mass. Feb. 27, 2004)............................................................................................................................ 34

*Cole v. Kimberly-Clark Corp.*, 102 F.3d 524 (Fed. Cir. 1996).................................................... 32

*David Nichols & Nichols Lures v. Strike King Lure Co.*, No. 3:99-CV-1950-BC, 2000 U.S. Dist. LEXIS 15781 (N.D. Tex. Oct. 25, 2000)..................................................................... 26

*E-Pass Techs., Inc. v. 3COM Corp.*, 343 F.3d 1364 (Fed. Cir. 2003)..................................... 9, 26

*Elekta Instr. S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302 (Fed. Cir. 2000) ..................... 38

*Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343 ( Fed. Cir. 2000).......................................... 21

*Engineered Prods. Co. v. Donaldson Co.*, 165 F. Supp. 2d 836 (N.D. Iowa 2001) .................... 34

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, No. 03-1179, 2004 U.S. App. LEXIS 5428 (Fed. Cir. Mar. 23, 2004)........................................................................................ 9

Graham v. John Deere Co., 383 U.S. 1 (1966)...........................................................................10

Harris Corp. v. IXYS Corp., 114 F.3d 1149 (Fed. Cir. 1997).......................................................21

Hemphill v. MCNEIL-PPC, Inc., 25 Fed. Appx. 915 (Fed. Cir. 2001).........................................34

Honeywell, Inc. v. Victor Co. of Japan, Ltd., No. 99-1607 (DWF/AJB), 2003 U.S. Dist.
LEXIS 7148 (D. Minn. Apr. 25, 2003)...........................................................................................34

IGC-Med. Advances, Inc. v. United States Instruments, Inc., 34 Fed. Appx. 715 (Fed.
Cir. 2002) .......................................................................................................................................21

Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc., 336 F.3d
1308 (Fed. Cir. 2003).............................................................................................................. 14, 32

Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323 (Fed. Cir. 2001)....................8

Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp., 309 F.3d 1365 (Fed. Cir.
2002) ...............................................................................................................................................35

JVW Enters. v. Interact Accessories, Inc., No MJG-00-1867, 2003 U.S. Dist. LEXIS
16221 (D. MD. May 6, 2003).........................................................................................................34

Jepson v. Egly, 231 F.2d 947 (C.C.P.A. 1956) .......................................................................20, 34

Johnson Worldwide Assocs, Inc. v. Zebco Corp., 175 F.3d 985 (Fed. Cir. 1999)......................26

K-2 Corp. v. Salomon S.A., 191 F.3d 1356 (Fed. Cir. 1999) .........................................................6

Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968 (Fed. Cir. 1999)............................31

Kinik Co. v. ITC, No. 02-1550, 2004 U.S. App. LEXIS 5543
(Fed. Cir. Mar. 25, 2004) ...................................................................................7, 9, 21, 25, 26

Kis, S.A. v. Foto Fantasy, Inc., 60 Fed. Appx. 319 (Fed. Cir. 2002) ..........................................15

Kohus v. Cosco, Inc., No. C-1-97-968, 1999 U.S. Dist. LEXIS 23010 (S.D. Ohio Aug.
17, 1999) .........................................................................................................................................34

Kothmann & Kothmann, Inc. v. Trinity Indus., 287 F. Supp. 2d 673 (S.D. Tx. 2003)...............15

Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362 (Fed. Cir. 2000)................................30, 31

Kudlacek v. DBC, Inc., 115 F. Supp. 2d 996 (N.D. Iowa. 2000).................................................34

Kumar v. Ovonic Battery Co., Inc., 351 F.3d 1364 (Fed. Cir. 2003)....................................10, 28

Leoutsakos v. Coll's Hosp. Pharm., Inc., No. 02-434-m, 2003 U.S. Dist. LEXIS 12591
(D. NH. July 8, 2003)...................................................................................................... 34

Liebel-Flarsheim Co. v. Madrad, Inc., 358 F.3d 898 (Fed. Cir. 2004)........................................ 26

Liebscher v. Boothroyd, 258 F.2d 948 (C.C.P.A. 1958) ............................................................ 8, 9

Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) ....................................... 6

Mas-Hamilton Group v. LaGard, 156 F.3d 1206 (Fed. Cir. 1998) ............................................. 33

Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473 (Fed. Cir. 1998) .......................... 10

Norian Corp. v. Stryker Corp., No. 02-1490, 2004 U.S. App. LEXIS 6545 (Fed. Cir. Apr.
6, 2004) ....................................................................................................................... 26

PIN/NIP, Inc. v. Platte Chem. Co., 304 F.3d 1235 (Fed. Cir. 2002)............................................ 9

Pfund v. U.S., 831 F.2d 1017 (Fed. Cl. 1998)............................................................................... 38

Phillips v. AWH Corp., No. 03-1269, 2004 U.S. App. LEXIS 6758 (Fed. Cir. Apr. 8,
2004) ....................................................................................................................... 8, 32

Pitney Bowes, Inc. v. Hewlett Packard Co., 182 F.3d 1298 (Fed. Cir. 1999) ............................ 11

Quigley v. Zimmerman, 22 C.C.P.A. 713 (C.C.P.A. 1934)................................................... 20, 34

Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243 (Fed. Cir. 1998)....................... 15

Rexnord Corp. v. Lairtram Corp., 274 F.3d 1336 (Fed. Cir. 2001)............................................... 6

Risdon Iron & Locomotive Works v. Medart, 158 U.S. 68 (1895)............................................... 32

Scimed Life Sys. v. Johnson & Johnson, 225 F. Supp. 2d 422 (D. Del. 2002) .......................... 34

Smithkline Diagnostics, Inc. v. Helena Labs. Corp., 859 F.2d 878 (Fed. Cir. 1988).................... 6

St. Flyers LLC v. Gen-X Sports, Inc., No. 01 Civ. 9669 (MBM), 2003 U.S. Dist. LEXIS
14597 (S.D.N.Y. Aug. 19, 2003)................................................................................... 34

Supergide Corp. v. DirecTV Enters., 358 F.3d 870 (Fed. Cir. 2004)............................................ 9

Tate Access Floors, Inc. v. Interface Architectural Res., Inc., 279 F.3d 1357 (Fed. Cir.
2002) ....................................................................................................................... 28

Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313 (Fed. Cir. 2002)..........................................7

Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193 (Fed. Cir. 2002) ..................... 6, 7, 14, 18

Toro Co. v. White Consol. Indus., 199 F.3d 1295 (Fed. Cir. 1999)..........................................7

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996) ..................................... 6, 13

Watts v. XL Sys., Inc., 232 F.3d 877 (Fed. Cir. 2000) .......................................................... 9, 10

## STATUTES

35 U.S.C. § 8     ......................................................................................................... 16

35 U.S.C. § 112, ¶ 6........................................................................................... 32, 33, 35

37 C.F.R. § 1.73 ....................................................................................................... 21

## MISCELLANEOUS

American Heritage® Dictionary of the English Language 1-2 (4th ed. 2002) ...................... 37, 39

Franklin D. Jones & Paul B. Schubert, Engineering Encyclopedia, A Condensed Encyclopedia and Mechanical Dictionary for Engineers, Mechanics, Technical Schools, Industrial Plants, and Public Libraries 1041-43 (3d ed. 1963).................................................... 12

McGraw-Hill Dictionary of Scientific and Technical Terms 1751 (6th ed.)........................ 11, 37

Dictionary of Automotive Terms and Abbreviations .................................................. 18

Joseph Lawrence Nayler, Dictionary of Mechanical Engineering 246 (4th ed.) ......................... 19

TAB Handbook of Hand & Power Tools, at 92 ......................................................... 18

**EXHIBIT LIST**

Exhibit A………………………….     U.S. Patent No. 6,457,387

Exhibit B………………………….     Joint Claim Construction of '387 Patent

Exhibit C………………………….     Copies of Unreported Cases

Exhibit D………………………….     Defendant's Disclosure of Claim Terms Believed to
Require Construction

Exhibit E………………………….     McGraw-Hill Dictionary of Scientific and Technical
Terms (6th ed.)

Exhibit F………………………….     Franklin D. Jones and Paul B. Schubert, Engineering
Encyclopedia, A Condensed Encyclopedia and
Mechanical Dictionary for Engineers, Mechanics,
Technical Schools, Industrial Plants, and Public
Libraries (3d ed. 1963)

Exhibit G………………………….     35 U.S.C. 8; Manual of Patent Examining Procedure
MPEP § 903.01; Manual of Patent Examining
Procedure MPEP § 904.01(c)

Exhibit H………………………….     U.S. PTO Manual of Classification

Exhibit I………………………….     TAB Handbook of Hand & Power Tools

Exhibit J………………………….     Dictionary of Automotive Terms and Abbreviations

Exhibit K………………………….     Joseph Lawrence Naylor, Dictionary of Mechanical
Engineering (4th ed.)

Exhibit L………………………….     37 C.F.R. 1.73; Manual of Patent Examining Procedure
§ 608.01(d)

Exhibit M………………………….     U.S. Patent No. 6,282,991

Exhibit N………………………….     U.S. Patent No. 6,282,992

Exhibit O………………………….     The American Heritage® Dictionary of the English
Language (4th ed. 2002)

## INTRODUCTION AND TECHNICAL BACKGROUND TO THE PATENT

This Court has ordered briefing and a hearing on the claim construction for U.S. Patent No. 6,457,387 ("the '387 patent") (Ex. A attached hereto.)  (December 4, 2003 Scheduling Order.)  Plaintiffs Easco Hand Tools, Inc., Armstrong Tools, Inc., Kinglsey Tools, Inc., Lea Way Hand Tool Corporation, and Matco Tools Corporation (collectively "Easco") provide this memorandum supporting their proposed constructions of the four disputed claim terms of the '387 patent and explaining why defendant Hu's proposed constructions are erroneous.[1]

Ratchet tools or devices come in many well-known types, including socket tools and box-end tools.  The similarities and differences of these tool types are central to this case.

Socket tools contain shafts, commonly referred to as drives, extending from the tool, onto which sockets of different sizes can be fitted.  Sockets have one side designed to receive the shaft or drive and the other side with a shaped recess to grab a fastener such as a nut or bolt.  The '387 patent is directed to socket tools with a particular ratcheting mechanism having a certain pawl design.  Each of the '387 patent claims at issue requires a "drive member," which, as discussed herein, is the shaft or shaft-like structure ordinarily associated with a socket tool.  The "drive member" is shown in Figures 1 (**23**) and 2 (**20**) of the '387 patent.

---

[1] On December 7, 2003, this Court ordered the consolidation of cases 3:02 CV 1723, which addressed defendant Hu's U.S. Patent No. 6,282,992 and 3:02 CV 1747, which addressed defendant Hu's U.S. Patent No. 6,457,387.  On February 27, 2004, Hu moved to dismiss the original 1723 case.  Due to Hu's motion, the parties provided a Joint Claim Construction Statement for claim terms of the '387 patent only.  (Ex. B attached hereto.)  Easco therefore directs its arguments solely to the '387 patent.



Fig. 2

('387 patent, Figs. 1 and 2.)  In Figure 1, the shaft end of the drive member (**23**) is shown

extending beyond the compartment.  In Figure 2, an entire drive member (**20**) is shown, with the

pawl (**30**) interfacing with a gear wheel (**21**)and the drive member's shaft (**23**) to drive a socket.

('387 patent, col. 6, ll. 2-6; col. 6, ll. 61-62.)  Hu has accused one model of Easco's socket

wrench tools of infringing the '387 patent.[2]

Easco also manufactures box-end type reversible ratchet wrench tools.  The '387 patent

does not disclose or teach a box-end ratchet.  Accordingly, the following illustration of a box-end

tool is from *another* of defendant Hu's patents, the one he no longer asserts in this action, U.S.

Patent No. 6,282,992.

---

[2] Easco has denied infringement of the '387 patent, and has also claimed that the '387
patent is invalid based in part on certain prior art, and is unenforceable due to the inequitable
conduct of Hu and his prosecuting attorney.



Fig. 1

('992 patent, Fig. 1.)  Box-end ratchet tools, unlike socket tools, have a through-hole in the head

of the wrench that fits around a nut or bolt.  Box-end tools do not have drive members.  Rather,

the inside of the gear wheel (**24**) in a box-end ratchet is notched to grasp the nut or bolt.

Despite the '387 patent's silence regarding box-end tools, Hu has repeatedly attempted to

include Easco's box-end wrench tools in this lawsuit.  Hu first accused them of infringing his

'992 patent.  Hu then voluntarily surrendered all of those accusations under the '992 patent.  (See

Hu's Mo. to Dismiss, at 2-3.)  Left with only his '387 patent in the case, Hu now attempts to

have this Court improperly expand the scope of the '387 patent to cover box-end wrenches.[3]

Hu's proposed claim constructions and arguments reveal his result-driven approach.  Hu

consults the proper sources of evidence relevant to claim construction, but then improperly

manipulates them to reach his desired end.  First, Hu seeks to define the claim terms by referring

to dictionaries, but does not refer to technical dictionaries that define the terms according to their

use by those of ordinary skill in the art of tool design.  Instead, Hu looks only to standard

---

[3] Hu accuses 8 box-end wrenches produced by Easco in response to Hu's Request For
Production of Documents and Things of infringing the '387 patent.

language dictionaries, pulling definitions out of context. Then, Hu exacerbates his error, modifying these general dictionary definitions to fit his litigation strategy.

Similarly, Hu improperly manipulates the '387 patent specification and intrinsic evidence depending on the result he seeks. With the disputed term "ratcheting tool," Hu seeks a narrow definition to avoid prior art.[4] To facilitate this narrowing, Hu argues that the patent specification limits the claims to handheld devices. (<u>See</u> Hu Br. at ll-12.) The specification, however, contains no actual language limiting the patent to such a narrow context. With the term "drive member," Hu seeks an expansive definition to support his infringement claims over Easco's box-end wrench tools. Although Hu purports to refer to the patent specification, in truth he ignores the specification's multiple references placing the invention within the context of socket tools with shafts or columns. (<u>See id.</u> at 17-18.) Hu also ignores that the specification makes absolutely no reference to covering box-end tools. (<u>See id.</u>)

In contrast, Easco consistently adheres to the claim construction principles specified by the United States Court of Appeals for the Federal Circuit. Easco's proposed constructions are grounded in the ordinary meaning of the terms attributed them by one of ordinary skill in the art as shown by technical dictionaries and treatises, and also by the intrinsic evidence including the patent claims, the patent specification, and the cited prior art. Thus, Easco proposes the proper construction of the four claim terms in dispute, and the Court should adopt those proposals.

## <u>THE '387 PATENT AND ITS CLAIMS</u>

Hu alleges that Easco infringes independent Claim 17 and dependent Claims 18-23 and 25 of the '387 patent. The four disputed claim terms at issue are: (1)"ratcheting tool"; (2)"drive

---

[4] In particular, Hu's proposals seek to limit his claims to handheld tools, thereby trying to avoid prior art produced by plaintiffs featuring reversible ratcheting mechanisms in other tools.

-4-

member"; (3)"mounted"; and (4)"bearing".  (See Ex. B.)  Claim 17 is representative of the

claims containing the first two terms, and Claim 22 represents those containing the latter two:

> 17.     A *ratcheting tool* comprising:
>
> a rotatably mounted *drive member* including a gear wheel having an outer
> periphery with a plurality of first teeth; and ….

('387 patent, col. 9, ll. 51-54 (emphasis added).)

> 22.     The ratcheting tool as claimed in claim 17, with the pawl *mounted* in a
> compartment section defined by a wall, with the pawl being moveable in a
> radial direction relative to the drive member, with the pawl *bearing*
> against a first point of the wall when the pawl is in the first ratcheting
> position and *bearing* against a second point of the wall when the pawl is in
> the second ratcheting position, with the second point being spaced from
> the first point.

('387 patent, col. 10, ll. 32-39 (emphasis added).)

> Easco proposes the following constructions of the disputed terms:

| | |
|---|---|
| Ratcheting Tool: | A tool having a mechanism that consists of a bar or wheel having inclined teeth with which a pawl interacts so that motion can be imparted to the wheel or bar. |
| Drive Member: | A shaft or shaft-like structure extended beyond the compartment. |
| Mounted: | Attached to, or held in position. |
| Bearing: | Touching sufficient to create a reactive force. |

(See Ex. B.)

## ARGUMENT

## I.     THE LAW OF CLAIM CONSTRUCTION PROVIDES THAT THE ORDINARY AND CUSTOMARY MEANING OF CLAIM TERMS TO ONE SKILLED IN THE ART IS FOUND IN THE INTRINSIC EVIDENCE.

Any patent infringement or invalidity analysis requires two steps.  "First a court must

determine as matter of law the correct scope and meaning of a disputed claim term.  …  Second,

the analysis requires a comparison of the properly construed claims to the accused device, to see

whether the device contains all the limitations, either literally or by equivalents, in the claimed invention." CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1365 (Fed. Cir. 2002) (citations omitted).  The first step, claim construction, is a question of law for the Court. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc) ("[T]he court has the power and obligation to construe as a matter of law the meaning of the language used in the patent claim.").

The axiomatic objective of claim construction is to determine how a hypothetical person possessing ordinary skill in the relevant art would understand the patent.  Smithkline Diagnostics, Inc. v. Helena Labs. Corp., 859 F.2d 878, 882 (Fed. Cir. 1988).  Rexnord Corp. v. Lairtram Corp., 274 F.3d 1336, 1342-43 (Fed. Cir. 2001).  "Intrinsic evidence" refers to the so-called patent documents – the claims, the written patent specification, its drawings/illustrations, and the patent's prosecution history.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language."  Id.

### A.    The Patent Claims.

In examining the intrinsic evidence, the court must begin with the words of the claims themselves.  Vitronics, 90 F.3d at 1582.  "'In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point [] out and distinctly claim [] the subject matter which the patentee regards as his invention.'"  Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1201-02 (Fed. Cir. 2002) (citations omitted).  There is a "heavy presumption" that the terms used in a claim "mean what they say and *have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art*."  Id. at 1202 (emphasis added); see also K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1365 (Fed. Cir. 1999) (noting that claim

construction "is firmly anchored in reality by the understanding of those of ordinary skill in the art."). The ordinary meaning to persons skilled in the relevant art is determined in the context of how the term is used in the patent documents. <u>Kinik Co. v. ITC</u>, No. 02-1550, 2004 U.S. App. LEXIS 5543, at *15-16 (Fed. Cir. Mar. 25, 2004)[5]; <u>see also</u> <u>Toro Co. v. White Consol. Indus.</u>, 199 F.3d 1295, 1299 (Fed. Cir. 1999) ("[T]he court must determine how a person of experience in the field of this invention would, upon reading the patent documents, understand the words used to define the invention.").

Federal Circuit precedent repeatedly recognizes that dictionaries, encyclopedias and treatises are valuable resources in claim construction and may be used to determine the ordinary meaning of the claim terms. <u>Texas Digital</u>, 308 F.3d at 1202; <u>see also</u> <u>Teleflex, Inc. v. Ficosa N. Am. Corp.</u>, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("The ordinary meaning of a claim term may be determined by reviewing a variety of sources, including … dictionaries and treatises …." (citations omitted)).[6]

Not all dictionaries, however, are created equal. Scientific dictionaries should generally be used for defining technical terms. <u>AFG Indus., Inc. v. Cardinal IG Co.</u>, 239 F.3d 1239, 1247-48 (Fed. Cir. 2001). Indeed, the Federal Circuit has strongly cautioned against the use of non-scientific dictionaries for defining technical words, holding that "'a general definition is secondary to the specific meaning of a technical term as it is used and understood in a particular technical field.'" <u>Id.</u> (citations omitted); <u>see also</u> <u>Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.</u>, 262 F.3d 1258, 1267 (Fed. Cir. 2001) (cautioning "against the use of non-scientific dictionaries, 'lest dictionary definitions … be converted into technical terms of

---

[5] Copies of any unreported cases are included as Ex. C.

[6] Dictionaries, encyclopedias and treatises are intrinsic evidence or aids thereto, and not extrinsic evidence or even a special form of extrinsic evidence. <u>Texas Digital</u>, 308 F.3d at 1203.

art having legal, not linguistic significance.'") (citations omitted); <u>Vitronics</u>, 90 F.3d at 1584 n.6

("[T]echnical treatises and dictionaries … are worthy of special note.")  Moreover, the Federal

Circuit has instructed that "[a] trial court, when construing a term of art, must define the term in

a manner consistent with the scientific and technical context in which it is used in the patent.

Only when the context is unclear, or it appears that the term is not being used in a technical

manner, should the trial court rely upon a general purpose dictionary for construing the term."

<u>AFG Indus.</u>, 239 F.3d at 1248. (holding trial court's incorrect definition of a technical term

resulted from improper reliance on a general dictionary definition).

### B.     The Patent Specification.

The second type of intrinsic evidence the trial court is required to examine when

construing disputed claim terms is the patent specification.  A court must consult the

specification, because it is "always highly relevant to the claim construction analysis [and] is the

single best guide to the meaning of a disputed term."  <u>Vitronics</u>, 90 F.3d at 1582; <u>see</u> <u>also</u>

<u>Interactive Gift Express, Inc. v. Compuserve, Inc.</u>, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (noting

that even where the claim language is clear the specification should still be consulted to

determine if any definitions should be modified).  Just this month the Federal Circuit reaffirmed

that courts "look to the specification 'to ascertain the meaning of a claim term as it is used by the

inventor in the context of the entirety of his invention.'"  <u>Phillips v. AWH Corp.</u>, No. 03-1269,

2004 U.S. App. LEXIS 6758, at * 12 (Fed. Cir. Apr. 8, 2004) (<u>quoting</u> <u>Comark Communications</u>

<u>v. Harris Corp.</u>, 156 F.3d 1182, 1187 (Fed. Cir. 1998)).

The patent specification, and the context and scope it provides to disputed terms, also

allows the court to choose the best among multiple dictionary definitions.  Indeed, the Federal

Circuit has long cautioned that "[i]ndiscriminate reliance on definitions found in dictionaries can

often produce absurd results."  <u>Liebscher v. Boothroyd</u>, 258 F.2d 948, 951 (C.C.P.A. 1958).

"Words are used in many senses and often have diametrically opposed meanings, depending upon the senses in which they are used." Id.

> [T]he words in which a claim is couched may not be read in a vacuum. One need not arbitrarily pick and choose from the various accepted definitions of a word to decide which meaning was intended as the word is used in a given claim. The subject matter, the context, etc., will more often than not lead to the correct conclusion.

Id.; see also E-Pass Techs., Inc. v. 3COM Corp., 343 F.3d 1364, 1368 (Fed. Cir. 2003) (holding that "[w]hen determining a claim term's ordinary meaning, we also look to the usage of the disputed claim term in context."); PIN/NIP, Inc. v. Platte Chem. Co., 304 F.3d 1235, 1244 (Fed. Cir. 2002) (holding that the construction of a term in a patent is a highly contextual exercise that is dependent upon the content of the particular patent in which the term appears).

While construing the claim language is aided by the explanations contained in the specification, limitations not present in the claims should not be "added" to the claims through the construction process. Superguide Corp. v. DirecTV Enters., 358 F.3d 870, 875 (Fed. Cir. 2004). However, "[p]atent claims are directed to the invention that is set forth in the specification." Kinik, 2004 U.S. App. LEXIS 5543, at *13. For example, in Globetrotter Software, Inc. v. Elan Computer Group, Inc., No. 03-1179, 2004 U.S. App. LEXIS 5428, at *11 (Fed. Cir. Mar. 23, 2004) the court looked to the specification to construe the phrase "a message preventing" as it applied to a license management system. Id. at *36. The court first looked to dictionaries to determine the ordinary and customary meaning of the term "prevent." Id. at 36-37. The court concluded that even after consulting the dictionaries, the language of the claim was ambiguous and looked to the specification in order to "shed light on the meaning" of the disputed claim term. Id. at 37. In Watts v. XL Sys., Inc., 232 F.3d 877 (Fed. Cir. 2000) the court looked to the specification to limit the term "sealingly connected" as it applied to the connecting sections of oil well pipes. Watts, 232 F.3d at 882. The court limited the term to connections by

-9-

misaligned taper angles, because the patent specification described only that one method –

misaligning the taper angles of the internal and external threads – to achieve the sealing

connection.  Id. at 882-83.

      **C.**      **The Prosecution History And Cited Prior Art.**

     In addition to the claim language and patent specification, the courts may also consult the

prosecution history and the prior art that it cites in performing claim construction.  Vitronics, 90

F.3d at 1582;  Kumar v. Ovonic Battery Co., Inc., 351 F.3d 1364, 1367-68 (Fed. Cir. 2003)

(noting that prior art may shed light on the meaning of claim term); Arthur A. Collins, Inc. v. N.

Telecom Ltd., 216 F.3d 1042, 1044-45 (Fed. Cir. 2000) (construing Time-Space-Time switch by

looking to the prior art"); Graham v. John Deere Co., 383 U.S. 1, 33 (1966) ("It is, of course,

well settled that an invention is construed not only in the light of the claims, but also with

reference to the file wrapper [specification and cited art]…..").  The prosecution history helps

inform construction of disputed claim terms, because it "reveals how those closest to the

patenting process – the [patentee] and the patent examiner – viewed the subject matter."

Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1478 (Fed. Cir. 1998).

     At bottom, after consulting the language of the claims themselves, the patent

specification, and the prosecution history with its cited prior art, the court should construe the

claim terms giving them the customary definition used and understood by persons of ordinary

skill in the relevant art (here the art of tool design) as viewed in the context of the patent

documents.

## II.    "RATCHETING TOOL"

### A.    Easco's Proposed Construction Reflects The Ordinary And Customary Meaning Of The Term To One Skilled In The Art And Is The Correct Construction Based On The Intrinsic Evidence.

The customary meaning to those of ordinary skill in the art of tool design of the term "ratcheting tool" is "a tool having a mechanism that consists of a bar or wheel having inclined teeth with which a pawl interacts so that motion can be imparted to the wheel or bar." (See Ex. B.)[7] Hu proposes "a contrivance held in and worked by the hand for performing or facilitating mechanical operations engaging a toothed wheel with a pawl." (See Ex. B.) Both constructions define the ratcheting operation similarly. However, Hu also seeks to have the Court manufacture and add a limitation – that the device must be "held in and worked by the hand" – not present in the claim language and not supported by the intrinsic evidence.

Turning first to the claims themselves, the claim language does not define "ratcheting tool." ('387 patent, col. 9, l. 51.) "Ratchet," is a technical term to those of ordinary skill in the art of tool design. Its customary meaning in the art is "a wheel, usually toothed, operating with a catch or pawl so as to rotate in only a single direction." McGraw-Hill Dictionary of Scientific and Technical Terms 1751 (6th ed.) (Ex. E. attached hereto); see also Franklin D. Jones & Paul B. Schubert, Engineering Encyclopedia, A Condensed Encyclopedia and Mechanical Dictionary

-------------------

[7] Easco proposes a construction for "ratcheting tool" because Hu initially disclosed the term as requiring construction. (See Def's. Disclosure of Claim Terms Believed to Require Construction, attached hereto as Ex. D.) Easco does not agree, however, that "ratcheting tool" is a limitation of Claim 17, as Hu wrongly presumes. (See Hu Br. at 8 n. 7.) A term within the preamble is considered a limitation only if it "is 'necessary to give life, meaning, and vitality' to the claim". Pitney Bowes, Inc. v. Hewlett Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999) (citations omitted). The preamble is not limiting if the claim sets forth the complete invention and the preamble simply serves to set forth "the purpose or intended use of the invention". Id. The structure of Hu's invention is fully described in the body of Claim 17. The term "ratcheting tool" describes only the intended use of the invention, the use of the reversible ratcheting pawl technique to turn a drive member in a ratcheting tool, and thus is not a claim limitation.

for Engineers, Mechanics, Technical Schools, Industrial Plants, and Public Libraries 1041-43 (3d ed. 1963) (defining "ratchet gearing" as consisting of a toothed ratchet wheel and a pawl or detent used to transmit intermittent motion or to prevent relative motion between two parts except in one direction.). (See Ex. F.)  This ordinary and customary meaning *is not limited* to hand tools with ratcheting mechanisms.  (See id.)

The '387 patent specification confirms that the correct construction of "ratcheting tool" is not limited to handheld instruments.  The specification consistently and repeatedly describes tools with a drive member and a wheel having inclined teeth with which a pawl interacts so that motion can be imparted to the wheel.  (See '387 patent col. 6, ll. 2-6, ll. 44-47.)  The specification does not state the tools in question must be handheld, does not use the term "handheld," and contains no restrictions or limitations to handheld tools.  Thus, Easco's definition properly encompasses "ratcheting tool[s]" as Hu describes his invention, and is not artificially limited to handheld tools.[8]

### B.    Hu's Proposed Construction Is Not Supported By The Intrinsic Evidence.

Hu's proposed limitation of "ratcheting tool" to those tools "held in and worked by the hand" does not appear in the language of the claim.  (See '387 patent, col. 7, l. 61 – col. 10, l. 54.)  Hu's attempt to read this limitation into the claim is legally flawed because (1) Hu wrongly employs general dictionary definitions different from technical definitions in the tool design context and then arbitrarily modifies those general definitions to suit his purpose, and (2) the proposed narrowing language "held in and worked by the hand" is neither addressed in nor supported by the intrinsic evidence.

---

[8] Hu criticizes Easco's proposed construction because it is "longer and more difficult to comprehend than Hu's."  (See Hu Br. at 14.)  Easco disagrees, but more importantly, the appropriate construction of a disputed term is the term's ordinary and customary meaning to one skilled in the art, regardless of its perceived complexity.

Ignoring Federal Circuit precedent, Hu does not use a technical dictionary to determine the ordinary and customary meaning of the technical term "ratcheting tool."  See e.g. AFG Indus., 239 F.3d at 1248 (explaining that a general dictionary definition is secondary to the specific meaning of a technical term as it is used and understood in a particular technical field) (citations omitted); Vitronics, 90 F.3d at 1584 n.6 ("[T]echnical treatises and dictionaries … are worthy of special note").  Hu instead looks to Webster's Unabridged Dictionary where he finds general English definitions of the terms "ratchet" and then "tool" divorced from the patent's context.  (See Hu Br. at 8,10.)  Several problems then flow from Hu taking these general definitions and attempting to force them into the patent's context.

As an initial matter, none of the general definitions helps Hu because none limit a tool to something "held in and worked by the hand."  (See Hu Br. at 10.)  Specifically, Hu's chosen definition, No. 1, defines a tool as "an implement, especially one held in the hand," but does not state that only handheld devices are "tools."  (See id.) [9]

Even if this definition did limit all "tools" to hand held devices, which it does not, Hu provides no legitimate basis to employ this definition and exclude all others.  Hu claims that "only definition 1 is pertinent to the use of the "tool" in the '387 patent," (see Hu Br. at 10), however definitions 2 through 5 are also pertinent to the mechanical and manual contexts of

---

[9] Unsuccessful in his search amongst the dictionary definitions for one expressly limiting tools to handheld devices, Hu turns to a "synonym addendum" where one synonym describes a tool as "a contrivance held in and worked by the hand."  (See Hu Br. at 10.)  Again, nothing here states that only handheld devices are tools.  In fact, other synonyms more broadly refer to "any tool or contrivance designed or used for a particular purpose" or "anything used in doing a certain work."  (See id.)  Thus, Hu manipulates one definition to bring it into line with his views.  Without any explanation or citation, Hu chooses one definition and converts its disjunctive "or" to the conjunctive "and."  (Compare Hu Br. at 10 ("the term 'tool' is a contrivance held in and worked by the hand") with Hu Br. at 10 n.14 ("tool" is … "an instrument … used or worked by hand" and even more generally, any "instrument used by a handicraftsman or laborer in his work.") (emphasis added)).

the '387 patent.  (See id.)  These alternate definitions encompass a broad list of tools, instruments and mechanical means, yet Hu ignores them.  (See id.)  Hu excludes these broader definitions based solely on his contention that the patent specification limits the use of "tool" to a handheld context.  (See Hu Br. at 11.)  The specification of the '387 patent, however contains no handheld limitation.

It is proper to use the patent specification to choose amongst dictionary definitions and provide the appropriate context for claim terms.  Texas Digital, 308 F.3d at 1203 (explaining that consulting the specification is particularly important to "identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor");  Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc., 336 F.3d 1308, 1315 (Fed. Cir. 2003)  (stating that "because words often have multiple dictionary definitions, some having no relation to the claimed invention, the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor").  Hu, however, attempts to stretch the words of the '387 patent specification into stating something they simply do not say.  (See Hu Br. at 11-12.)  Neither of the two portions of the specification Hu quotes limit the patented invention to handheld tools:

> The present invention relates to a reversible ratcheting tool having a smaller head and improved driving torque for convenient use in a limited space.

> It is the primary object of the present invention to provide a reversible ratcheting tool with a small head while providing improved driving torque for convenient use in a limited space.

(Id. (quoting '387 patent, col. 1, ll. 7-9, col. col. 2. ll. 17-20).)  Neither quotation uses the term

handheld or explains why the smaller mechanics of the patent's ratcheting mechanism are not

applicable in non-handheld ratcheting mechanisms.[10]

In fact, nothing in the patent specification limits the purported invention to a handheld

tool.  The term "ratcheting tool" (or ratchet tool) is used twenty-five (25) times in the claims and

nineteen (19) times in the specification.  None are limited to a handheld tool or one that is "held

in and worked by the hand."  Therefore, the patent specification provides no basis to support

Hu's strategically chosen and modified definition and no basis to restrict "ratcheting tool" to

handheld tools.  See Kis, S.A. v. Foto Fantasy, Inc., 60 Fed. Appx. 319, 323 (Fed. Cir. 2002)

(rejecting the proposed requirement for two monitors displaying different images at the same

time, because nothing in the claim language or written description stated or even implied the

requirement); Kothmann & Kothmann, Inc. v. Trinity Indus., 287 F. Supp. 2d 673, 690 (S.D. Tx.

2003) (rejecting proposed construction because the specification did not contain a limitation that

the "impact head" contain mechanical interlocking properties).  For this reason, the '387 patent

specification differs significantly from the specification in Renishaw PLC v. Marposs Societa'

per Azioni, 158 F.3d 1243 (Fed. Cir. 1998).  (See Hu Br. at ll-12.)  In Renishaw, the

specification helped define the term "when" because it required timing very soon after an event.

(Id.)  Here, in contrast, nothing in the '387 patent specification requires that for the invention's

_____

[10] For example, if the prior art ratcheting mechanisms placed in wrenches were measured
in millimeters, then the invention's mechanism would reduce the original wrench size by a
certain number of millimeters and allow for a smaller wrench head.  Similarly, if the prior art
ratcheting mechanisms were placed in a car jack measured in inches, then the invention's
mechanism would reduce the required jack size by a corresponding number of inches and allow
for a smaller jack head capable of fitting under lower-riding cars.  The size benefits of the
invention relate equally to larger ratcheting tools, such as car jacks in this example, as they do to
a wrench, contrary to Hu's unsupported claim that the invention "does not make sense in the
context of larger machinery."  (See Hu Br. at 12.)

ratcheting mechanism to work it must be contained in a tool held in and worked by a handheld ratcheting wrench.  (See generally '387 patent.)   Hu's reliance on Renishaw, therefore, is misplaced.

Hu similarly misinterprets the prosecution history in contending that it "indicates that the term "tool" is limited to a handheld contrivance."  (See Hu Br. at 12.)  Hu bases this argument on the fact that the examiner searched for prior art in subclasses 60-63, 63.1, and 63.2 within class 81.  Hu provides no authority that prior art classifications searched by the examiner limit the scope of the invention.[11]  More importantly, not all of the prior art cited by Hu during prosecution was within the classes referenced in his brief.  Indeed, art Hu cited falls within classes beyond hand tools.[12]

Hu is trying artificially to narrow the scope of "ratcheting tool" to avoid certain prior art that could render the '387 patent invalid.  In so doing, Hu wrongly ignores the meaning of this technical term of art to those of ordinary skill in favor of his own modified definition

---

[11] The purpose of the patent classification system is to allow "determining with readiness and accuracy the novelty of inventions for which applications for patent are filed."  35 U.S.C. § 8; (Manual of Patent Examining Procedure MPEP § 903.01 (Ex. G attached hereto)).  The system doesn't limit the scope or application of inventions.  See id.  The patent classification system is used by the patent examiners to develop fields which will be searched for prior art.  (MPEP § 904.01 (c).)  (See Ex. G)  Importantly, that prior art search is not limited to only that art within the same classification as the claimed invention.  Id.  The fact that the examiner is required to search other classifications for applicable art shows that the classification of the claimed invention does not define the invention's scope.

[12] Hu cites prior art in classifications 7, Compound Tools; 16, Miscellaneous Hardware; 24, Buckles, Buttons, Clasps; 73, Measuring & Testing; 74, Machine Element or Mechanism; 192, Clutches & Power-Stop Control and 464, Rotary Shafts, Gudgeons, Housings & Flexible Couplings For Rotary Shafts.  (U. S. PTO Manual of Classification attached hereto as Ex. H.)

disconnected from the context of the patent's claim language, specification, and prosecution history.  Easco respectfully requests that the Court reject Hu's legally erroneous construction.[13]

## III.     "DRIVE MEMBER"

"Drive member" should be given its customary meaning to one of ordinary skill in the art – "a shaft or shaft-like structure extended beyond the compartment."  (See Easco's Proposed Construction Ex. B.)  Technical dictionaries and case law construing comparable terms establish that Easco's proposed construction reflects ordinary meaning to a person skilled in the art. Moreover, every description, depiction and embodiment of the purported invention in the '387 patent establishes that "drive member" is a shaft extended beyond the compartment.

Hu proposes construing "drive member" as "a constituent part of any structural unit or composite whole that causes something to move by force or compulsion in a direction."  (See Ex. B.)  Hu's construction is not found in any technical dictionary, but rather is based on a modification of a general dictionary definition unrelated to the customary meaning of this technical term.  Hu's definition has no support in the claim language or intrinsic evidence. Furthermore, Hu's construction is expressed completely in functional terms, devoid of *any* structural characteristics.  Thus, Hu attempts to capture with his proposed construction any possible structural component that performs the stated function, rather than only the structures contemplated in the '387 patent.  Such sweeping coverage is legally impermissible, and should be rejected.

---

[13] Easco disagrees with Hu's assertion that Easco has failed to offer a construction of "tool" as required by the Court's Scheduling Order.  (See Hu Br. at 15.)  Pursuant to the Parties Joint Claim Construction Statement, the term to be construed is "ratcheting tool," a technical term of art in the tool design field, not, as Hu would have this Court believe, the singular term "tool."  (See Ex. B.)  Easco has provided a construction for the complete term "ratcheting tool" as required based upon applicable definitions and the usage of the entire term in the '387 patent. See, supra, § II.A.

**A.      The Intrinsic Evidence Supports Easco's Construction.**

1.      The Claim Language.

Claim 17 uses but does not define the technical claim term "drive member".[14]  As used

by a person skilled in the art of tool design and defined in tool design and mechanical

engineering dictionaries, treatises and encyclopedias, both words in the term "drive member"

mean a shaft, beam or column with an extended end.

a.      "Drive" means a shaft that turns a socket.

The term "drive" specifically refers to the shaft structure of a ratcheting tool used to drive

a socket.  TAB Handbook of Hand & Power Tools, at 92 ("[t]he stud on the handle is called a

drive.").[15]  (See Ex. I.)  A "drive" is: "a tool which has a square end (1/4 inch, 3/8 inch, or ½

inch) which fits into a recess in a corresponding socket for the installation or removal of nuts and

bolts."  The Dictionary of Automotive Terms and Abbreviations (Ex. J. attached hereto.)

Hu incorrectly ignores these  technical dictionaries and treatises as the proper source of

the ordinary and customary meaning of "drive member" in the context of the tool design art.  See

AFG Indust., 239 F.3d at 1248 (explaining that only when the patent's context is unclear, or it

appears that the term is not being used in a technical manner, should the court rely upon a

general dictionary definition for construing the term).[16]  Instead, Hu attempts to cobble together a

---

[14] Claim 17 states: "… a rotatably mounted drive member including a gear wheel …."
The parties have agreed on the construction of the terms "including" and "gear wheel."  ('387
patent, col. 9, 11. 53; Ex. B.)

[15] Notably, the TAB Handbook also defines box-end wrenches.  The Handbook states, in
relevant part, that box end wrenches have a closed, circular opening at the end of a handle.
There is no reference to drive member in the discussion of box-end wrenches.  (See Ex. I at 90-
91.)

[16] See also Abbot Labs. v. Syntron Bioresearch, Inc., 334 F.3d 1343, 1354 (Fed. Cir.
2003) (relying on Fundamentals Of Analytical Chemistry (7th ed. 1996), to define "analyte");
Texas Digital, 308 F.3d at 1206 (relying on the Modern Dictionary Of Electronics to define

broader definition from definitions he finds in general English dictionaries.  (See Hu Br. at 15-18.)  From thirty-nine general definitions, Hu selects the following two definitions of "drive":

1.    To send, expel, or otherwise cause to move by force or compulsion: *to drive away the flies; to drive back an attacking army; to drive  a person to desperation*;

2.    To cause and guide the movement of (a vehicle, an animal, etc.): *to drive a car; to drive a mule*.

(Id. at 15-16.)  On their face, these definitions are inapplicable to tool design.  The context of the '387 patent is completely different from driving an army, car or mule.  (See '387 patent.)

Hu tries to buttress using his definitions by claiming they are consistent with the patent specification.  (See Hu Br. at 16-17.)  Contrary to Hu's assertions, the '387 patent is not consistent with such broad and unrelated definitions.  Rather, the specification uses drive in a much more specific sense – a tool design with a shaft turning a socket.  Indeed, the only patent language quoted by Hu as providing the relevant context for "drive" expressly acknowledges this specific definition:

Thus, the teeth **31** of the pawl **30** is forced to engage with the teeth **211** of the gear wheel **21** of the drive member **20**, best shown in FIG 6.  The ratcheting tool is now in a status *for driving a socket* (not shown) or the like clockwise.  ('387 patent, col. 6, ll. 4-6.)

 (See Hu Br. at 17 (emphasis added).)

b.    "Member" also means shaft or column.

"Member" is defined to have a similar structural meaning.  "When construing the design of a mechanism or structure, a member is taken to be a single definable part, such as beam, plate or column which can be easily analyzed and stressed."  Joseph Lawrence Naylor, Dictionary of Mechanical Engineering 246 (4th ed.).  (See Ex. K. attached hereto.)  Consistent with this

_____

"activate"); Apex Inc. v. Raritan Computer, Inc., 325 F.3d 1364, 1373 (Fed. Cir. 2003) (using the Dictionary Of Computing to define "circuit").

technical definition, courts have construed the term "member" to be a shaft or beam structure.  In

CCS Fitness, for example, the Federal Circuit construed the term "reciprocating member"  and

concluded that the term "member" "denotes a *beam-like structure* that is a 'single unit in a larger

whole.'"  CCS Fitness, 288 F.3d at 1367 (emphasis added).  See also Jepson v. Egly, 231 F.2d

947, 950 (C.C.P.A. 1956) (concluding that "drive member" was "the shaft which drives one of

the rollers"); Quigley v. Zimmerman, 22 C.C.P.A. 713, 715 (C.C.P.A. 1934) (using the term

"flexible drive shaft" interchangeably with the term "flexible drive member").

In contrast, Hu's proposed definition of "member" ignores the technical sources and legal

precedent, trying instead to force upon the patent a general architectural usage:

> A constituent part of any structural or composite whole as a subordinate
> architectural feature of a building.

(See Hu Br. at 17-18.)  The '387 patent does not use this broad language, but rather employs

"member" in a precise way known in the art of tool design – as a shaft or column – as shown

again by the patent language Hu himself quotes:

> Rotatably mounted in the head **12** is a *drive member* **20** *having an upper end* **22**, *a
> drive column* **23** *on a lower end* thereof, and a gear wheel **21** formed in an
> intermediate portion thereof.  ('387 patent, col. 4, ll. 16-19.)

(See Hu Br. at 18 (emphasis added).)  In the '387 patent, a "member" is not any conceivable

component part (as Hu proposes), but rather one having a shaft at one end.

### 2.   The Patent Specification.

#### a.   The Specification Consistently Refers to "Drive Member" as a Shaft or Shaft-Like Structure Extending Beyond the Compartment.

Not only do the two patent references quoted by Hu utilize "drive member" in the

structural sense known to tool designers, but the entire '387 patent consistently refers to a drive

member as a shaft with an extended end.  Indeed, Hu himself described these features as necessary components of his invention: [17]

> A ratcheting tool in accordance with the present invention comprises:
>
> > a handle;
> >
> > a head extended form the handle and having a compartment therein;
> >
> > *a drive member including a first end extended beyond the compartment*, *a second end extended beyond the compartment*, and a gear wheel formed between the first end and the second end, …;

('387 patent col. 2, ll. 21-30, Summary of the Invention (emphasis added).)

The purpose of the Summary of the Invention is to apprise the public of the nature of the invention.  37 C.F.R. § 1.73; (Manual of Patent Examining Procedure MPEP § 608.01(d).)  (See Ex. L attached hereto.)  "The summary should be directed to the specific invention being claimed, in contradistinction to mere generalities that would be equally applicable to numerous preceding patents."  (MPEP § 608.01(d).)  The Summary is of material assistance in aiding ready understanding of the invention.  (Id.)

The Federal Circuit has repeatedly relied on the Summary of the Invention when construing a disputed claim term.  In Kinik Co., although not present in any dictionary definition of the term "mixture," the Court relied on the statement in the Summary that "the volume of the binder composition or binder phase in the mixture substantially exceeds the volume of the powdered composition" in construing the term "mixture" to require more of one component than the other.  Kinik Co., 2004 U.S. App. LEXIS 5543, at *11.  See also CCS Fitness, 288 F.3d at 1364 (relying on the Summary in construing "reciprocating member"); IGC - Med. Advances,

---

[17] Using the word "comprising" in a patent means "is necessarily included."  Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1344-45 (Fed. Cir. 2003) (explaining that "[c]omprising is a term of art used in claim language which means that the named elements are essential ….") (internal citation omitted).

Inc. v. United States Instruments, Inc., 34 Fed. Appx. 715, 719 (Fed. Cir. 2002) (relying on the

Summary to construe "arched supports"); Embrex, Inc. v. Serv. Eng'g Corp., 216 F.3d 1343,

1348 ( Fed. Cir. 2000) (relying on the Summary to construe "controlling an immunizable

disease"); Harris Corp. v. IXYS Corp., 114 F.3d 1149, 1153 (Fed. Cir. 1997) (relying on

Summary in construing a device that did not latch under any conditions).

In addition to the Summary of the Invention, the '387 patent specification confirms

Easco's proposed construction.  The diagrams of the '387 patent refer solely to a ratcheting tool

with a shaft or shaft-like structure extended beyond the compartment.  Figure 1 is a perspective

view of a reversible ratcheting tool in accordance with the '387 invention.  ('387 patent, col. 3, ll.

16-17.)  It discloses a shaft or shaft-like structure extended beyond the compartment.  Figure 2 is

an exploded perspective view of the reversible ratcheting tool, disclosing a drive member **20**

comprising a shaft or shaft-like structure extended beyond the compartment.  ('387 patent col. 3,

ll. 18-19.)



Fig. 1



Fig. 2

Figures 6 and 7 are both sectional views of the head of the ratcheting tool. ('387 patent, col. 3, ll. 51-54.) In both, the drive member **20** is disclosed as a shaft or shaft-like structure extended beyond the compartment.



6-6
Fig. 6



7-7
Fig. 7

The textual references to "drive member" in the '387 patent specification further support Easco's proper construction. Numerous references describe the above Figures as disclosing the drive member as a column or some other form of shaft-like structure extended beyond the compartment:

| '387 patent specification | Reference (emphasis added) |
|---|---|
| '387 patent, col. 6, ll. 2-4 | "Thus, the teeth **31** of the pawl **30** is forced to engage with the teeth **211** of the gear wheel **21** of the drive member **20**, *best shown in FIG. 6*." |
| '387 patent, col. 6, ll. 60-63 | "Thus, the teeth of the pawl **30** are forced to reengage with the teeth **211** of the gear wheel **21** of the drive member **20** (*see FIG. 6*). The ratcheting tool is now in a status for driving the socket counterclockwise." |
| '387 patent, col. 4, ll. 25-27 | *Referring to Figs. 1, 2, 6* "the drive member **20** further includes a central through hole 24 with a shoulder portion **241**...." |
| '387 patent, col. 4, ll. 28-29 | *Referring to Figs. 1, 2, 6* "a pushpin **25** is mounted in the through-hole **24** of the drive member **20**." |
| '387 patent, col. 5, ll. 62-63 | *Still referring to Figs. 1, 2, 6* "into the annular groove **222** of the drive member **20**." |

Other references expressly refer to a drive member with a first and/or second end establishing the drive member as a column or some other form of shaft-like structure extending beyond the compartment:

-23-

| '387 patent specification | Reference (emphasis added) |
|---|---|
| '387 patent, col. 4, ll. 16-19 | "Rotatably mounted in the head **12** is a drive member **20** *having an upper end* **22**, a drive column **23** *on a lower end* thereof …." |
| '387 patent, col. 4, ll. 21-24 | "The *upper end* **22** of the drive member 20 includes an engaging groove **221**, and an annular groove **222** is defined in a side of gear wheel **21**." |
| '387 patent, col. 4, ll. 60-61 | "A ring **40** is pivotally mounted around the *upper end* **22** of the drive member **20**." |
| '387 patent, col. 5, ll. 1-3 | "A reversing plate **50** is mounted around the *upper end* **22** of the drive member **20** and includes a hole **51** and a thumbpiece **52**." |
| '387 patent, col. 5, ll. 11-15 | "A C-clip **53** is mounted around a portion of the engaging groove **221** of the *upper end* **22** of the drive member **20**, thereby retaining the upper end **22** of the drive member **20** to the top face of the head." |
| '387 patent, col. 5, ll. 16-20 | "In addition, the positioning piece **511** is extended into the remaining portion of the engaging groove **221** of the drive member **20**. Thus the reversing plate **50** is pivotally engaged with the *upper end* **22** of the drive member **20**." |
| '387 patent, col. 5, ll. 49-53 | "As the pin **5211** is retained in place and the positioning piece **511** of the reversing plate **50** is engaged with the engaging groove **221** of the drive member **20**, the reversing plate **50** is securely yet pivotally engaged with the *upper end* **22** of the drive member **20**." |

The specification also refers to multiple embodiments of the alleged invention. (See '387 patent col. 4, ll. 47-49 ("Referring to Fig. 2A, the side of the pawl **30** has a plurality of teeth (ten teeth in this embodiment) for engaging with the gear wheel teeth 211"); '387 patent col. 5, ll. 54-59 ("A transmission member **70** is provided to convert manual pivotal movement of the reversing plate **50** into pivotal movement of the pawl **30** about the rotational axis of the gear wheel **21**. In this embodiment, the transmission member **70** is in the form of a spring having a relatively small pitch.").) Significantly, none of these embodiments describe any variation from a shaft-like structure extending beyond the compartment.

> b.    The Proper Definition of "Drive Member" Does Not "Import" Limitations from the Specification.

Easco's proposed construction does not import limitations from the specification into the claim term "drive member," as Hu contends, for several reasons. (See Hu Br. at 18-19.) First, Hu's argument is based on the false premise that Easco's construction does not reflect the

defined ordinary meaning of the terms.  (See id.)  In fact, far from arguing that the ordinary and customary meanings of "drive" and "member" do not apply (see Hu Br. at 19), Easco identifies the ordinary and customary meanings to a person skilled in the art and applies them here.  (See, supra, § III.A.1.)  Furthermore, by adhering to definitions from tool design technical sources, Easco reduces any risk of importing limitations into the claims from the specification.  Texas Digital, 308 F.3d at 1205 ("By examining relevant dictionaries, encyclopedias and treatises to ascertain possible meanings that would have been attributed to the words of the claims by those skilled in the art, … the full breadth of the limitations intended by the inventor will be more accurately determined and the *improper importation of unintended limitations from the written description into the claims will be more easily avoided*."  (emphasis added)).  Those technical dictionaries and treatises, and the patent specification itself, regularly and consistently identify the ordinary meaning as a shaft or shaft-like structure extended beyond the compartment.  (See supra § III.A.1 and 2.)  The claim term "drive member" used in the context of tool design requires this definition, and Easco has not imported any additional limitations.[18]

Second, as a matter of law, claims are limited by what the patent specification describes. Kinik, 2004 U.S. App. LEXIS 5543, at *13.  The Kinik Court was faced with an analogous situation in construing the term "mixture."  Kinik, 2004 U.S. App. LEXIS 5543, at *15-16.  The Federal Circuit held that "mixture," as properly construed in the context of the patent-in-suit, required more of one component (the liquid binder) than the other (powdered matrix),  despite

---

[18] Hu also mistakenly attempts to foist a heavy burden of overcoming what Hu claims is the ordinary and customary meaning of "drive member" onto plaintiffs' shoulders.  (See Hu Br. at 19.)  As shown above, plaintiffs rely on the ordinary meaning in the relevant art, and it is Hu who seeks to avoid that ordinary meaning and import broader definitions.  Hu, therefore, bears and has failed to carry this heavy burden.

the fact that the ordinary dictionary definition did not limit "mixture" by the proportions of its

components. Kinik, 2004 U.S. App. LEXIS 5543, at *16-17. The Court explained

> the issue is not one of dictionary definition of a common word, but the meaning of 'mixture' as used in the patent documents. … The words of patent claims have the meaning and scope with which they are used in the specification and the prosecution history.

Kinik, 2004 U.S. App. LEXIS 5543, at *16 (citations omitted). See also Norian Corp. v. Stryker

Corp., No. 02-1490, 2004 U.S. App. LEXIS 6545, at *6 (Fed. Cir. Apr. 6, 2004) (agreeing with

district court's observation that although the "the most natural reading of the term 'phosphoric

acid source' would be a source of phosphoric acid," that is not the way the term is defined in the

specification."); David Nichols & Nichols Lures v. Strike King Lure Co., No. 3:99-CV-1950-

BC, 2000 U.S. Dist. LEXIS 15781, *27-28 (N.D. Tex. Oct. 25, 2000) (rejecting dictionary

definition of "a large plurality" as being ambiguous and construing "a large plurality" based on

the specification as requiring "sufficient glitter to cover essentially the entire light receiving

surface"). In these cases, the Federal Circuit made clear that in any conflict between a dictionary

definition and the patent specification, the courts should defer to the specification. Easco's

proposed construction of "drive member," however, raises even less of a concern than the claims

interpreted in these cases, because Easco's construction not only reflects what is described by the

'387 patent specification, it also comports with the technical dictionary definitions. There is no

conflict between the dictionary definition and the patent specification. Both utilize "drive

member" as a shaft or shaft-like structure extended beyond the compartment to drive a socket.[19]

---

[19] None of the three cases Hu cites are availing. (See Hu Br. at 19-20.) In E-Pass Technologies, Inc. v. 3COM Corp., 343 F.3d 1364, 1368 (Fed. Cir. 2003), the Federal Circuit held it was improper for the district court to rely on extrinsic standards. Here, however, Easco relies not on extrinsic evidence to provide the ordinary meaning of "drive member," but rather on technical dictionaries and other *intrinsic* evidence to define the claim term. In Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985 990-91 (Fed. Cir. 1999), the defendant conceded the ordinary meaning of the disputed term did not include its proposed limitation. In

Lastly, Hu's attempt to ignore the descriptions of "drive member" in the patent specification flies in the face of his *own* analysis with respect to "ratcheting tool." In the context of "ratcheting tool," Hu purports to analyze the specification to determine the scope and limits of that term based on its use therein. (See Hu Br. at 10-12.) Hu addresses the Summary of the Invention and the Detailed Description of the Preferred Embodiment to argue that "ratcheting tool" has a meaning more limited than the general dictionary meaning. (See id. at 11-12.) Indeed, Hu warns that employing definitions of "tool" other than those that find support in the intrinsic evidence "could include large machinery, oilfield tools, or other devices not even remotely envisioned by the inventor." (See Hu Br. at 14.) Although the ultimate construction Hu adopts for "ratcheting tool" is incorrect,[20] his reference to the specification to determine the meaning of the term in the context of the patent is conceptually proper.

In his arguments regarding "drive member," however, Hu abandons any genuine use of the specification to determine the correct construction of the claim term. Instead, Hu creates a broad and vague definition disconnected from the mechanical context of tool design. (See Hu Br. at 15.) Hu then baldly contends the specification is not inconsistent with that construction and terminates his review of the specification. (See Hu Br. at 17.) In point of fact, the specification directly contradicts his broad and vague construction. The specification repeatedly

_____

contrast, Easco's proposed construction of "drive member" is the ordinary meaning and does include the shaft limitation. Lastly, in Liebel-Flarsheim Co. v. Madrad, Inc., 358 F.3d 898, 905-08 (Fed. Cir. 2004), the Court refused to require a "pressure jacket," because the claims did not use that term and the specification did not require it. Here, just the opposites are true – the claims use the term "drive member" and both its ordinary meaning and the patent specification require it to be a shaft or shaft-like structure extended beyond the compartment.

[20] As discussed above, Hu's ultimate construction of "ratcheting tool" fails because the specification simply does not contain the restrictive language Hu claims it does. (See, supra, § II.B.) In contrast, the specification contains repeated structural restrictions defining the relevant type of drive member; restrictions Hu wrongly ignores.

and consistently refers to a particular structure known to those of ordinary skill in the art as a shaft or shaft-like structure extending beyond the compartment where a socket can be attached. (See, supra, § III.A.2.a.)  Unable to explain these repeated structural requirements, Hu simply ignores them.  Hu's attempt to rely on the specification for "ratcheting tool" but turn a blind eye to it for "drive member" is erroneous and should be rejected.

> 3.     The Prosecution History And Cited Prior Art Support Easco's Proposed Construction.

Hu's other patents, which he cited in prosecuting the '387 patent, reveal that when he wanted to claim a box-end wrench he did so expressly and by specifically redefining "drive member" from its ordinary meaning. [21]  In the Information Disclosure Statement (IDS) he submitted during his prosecution of the '387 patent, Hu cited two of his own U.S. Patents Nos. 6,282,991 (Ex. M attached hereto) and 6,282,992 (Ex. N attached hereto).  (See Hu Br. at Ex. F.10.)  Unlike the '387 patent, the '991 and '992 patents discuss box-end ratchet tools (see e.g. Fig. 1) in addition to conventional socket tools (see e.g. Fig. 7):

---

[21] "Prior art cited in the prosecution history falls within the category of intrinsic evidence."  Tate Access Floors, Inc. v. Interface Architectural Res., Inc., 279 F.3d 1357, 1372 (Fed. Cir. 2002).  It is proper to examine the cited prior art in order to properly construe claim terms.  See also Kumar v. Ovonic Battery Co., 351 F.3d 1364, 1367-68 (Fed. Cir. 2003) (noting that "when prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term ….").







('991 patent Fig. 1
('992 patent Fig. 1
consistent in relevant part).)

('991 patent Fig. 7
('992 patent Fig. 7
consistent in relevant part).)

In both the '991 and '992 patents, Hu makes clear that a gear wheel in a box-end wrench and a drive member in a socket wrench are two different things:

> FIG. 7 illustrates a second embodiment in accordance with the present invention, wherein the *gear wheel is replaced by a drive member* ….

('991 patent, col. 5, ll. 7-9; '992 patent, col. 4, ll. 57-59 (emphasis added).)

Moreover, in both the '991 and '992 patent specifications, Hu makes clear that he must redefine the term "drive member" in order to take it from a socket wrench context to a box-end wrench context. (See '991 patent, col. 3, ll. 66-67; '992 patent col. 4, ll. 61-92.) Specifically, Hu states that for a box-end wrench, "[a] drive member (*in the form of a gear wheel 20 in this embodiment*) is mounted in the head." (See id.) If the ordinary meaning of "drive member" included merely a gear wheel without a shaft or shaft-like structure, Hu would not need to explicitly state that for a box-end wrench he is specially redefining the drive member as a gear wheel. When Hu redefines "drive member" in this way to denote simply a gear wheel he acts as his own lexicographer and assigns a new meaning to drive member other than what it ordinarily means to a person skilled in the art. See CCS Fitness, 288 F.3d at 1366 ("[a] claim term will not

-29-

receive its ordinary meaning if the patentee acted as his own lexicographer".)  Thus, in the '991 and '992 patents, a "drive member" in a box-end wrench is properly construed as only a gear wheel, because of Hu's specialized redefinition in the specification.

Significantly, Hu provided no such special definition of "drive member" in the '387 patent.  In the '387 patent, "drive member" is accompanied by no statement that the term is intended to cover any structure other than the shaft-like structure extending beyond the compartment, let alone a gear wheel or ratchet wheel on their own.  (See generally '387 patent.) And there is no hint in the '387 specification – neither in the figures nor in the text – that would lead a person of ordinary skill in the art to conclude that Claim 17's use of the term "drive member" encompasses anything other than its ordinary meaning of a shaft extended beyond the compartment.  The '991 and '992 patents demonstrate that when Hu intended for his patent to encompass a box-end ratcheting tool he was quite capable of drafting a patent specification to apprise those skilled in the art of this scope.  Hu did not draft such a specialized meaning in the '387 specification and cannot rewrite the specification now. [22]

**B.    Claim Differentiation Principles Do Not Change The Proper Construction Of "Drive Member".**

Claim differentiation does not apply here.  "Under the doctrine of claim differentiation, two claims of a patent are presumptively of different scope."  Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1366-7 (Fed. Cir. 2000).  Claim 18 claims "the ratcheting tool as claimed in

---

[22] An additional patent issued to plaintiff Hu in this field (U.S. Patent No. 6,263,767) further establishes that the phrase "drive member" does not ordinarily denote a mere gear wheel or ratchet wheel without a projection beyond the wrench head.  In '767, Hu claims only a box-end ratchet wrench, with the rotatable element of the wrench consisting solely of a gear wheel or ratchet wheel; and Hu describes that element as "a ratchet gear **20** is mounted in the box end." ('767 patent, col. 4, 1. 34.)  Thus Hu does not use the phrase "drive member" when his patent is limited to box-end wrenches and not directed to ratcheting tools with shaft-like structures.  (See id.)

claim 17, with the drive member including a drive column for *releasably engaging with a socket*." ('387 patent, col. 10, ll. 17-19.) Hu asserts that Easco's construction of "drive member" as "a shaft or shaft-like structure extended beyond the compartment" renders Claim 18 superfluous and redundant of Claim 17. (See Hu Br. at 20.) This is not so. Easco's proposed construction of drive member in Claim 17 does not require "releasably engaging with a socket." (See Ex. B.) Thus, dependent Claim 18 is of a narrower scope that independent Claim 17 and the doctrine of claim differentiation is satisfied. "[N]ot every limitation must be distinguished from its counterpart in another claim, but only at least one limitation must differ." Kraft Foods, 203 F.3d at 1368.

Moreover, claim differentiation never justifies departing from the correct claim construction, even if the claims end up having the same coverage. Kraft Foods, 203 F.3d at 1368. "[C]laim differentiation only creates a presumption that each claim in a patent has a different scope; it is 'not a hard and fast rule of construction.'" Id. "Claim differentiation can not broaden claims beyond their correct scope." Id. (citations omitted); see also Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 972 (Fed. Cir. 1999) (holding that the canon of claim construction is not a rigid rule). Accordingly, principles of claim differentiation present no basis to deviate from the proper construction of "drive member."

### C.     Hu's Proposed Construction Of "Drive Member" Requires The Court To Define Structural Limitations From The Specification As A Matter Of Law.

Hu's proposed construction of drive member lacks any structural description and instead merely characterizes a function – "a constituent part of any structure that causes something to move by force or compulsion in a direction." (See Ex. B.) As a result, Hu's proposed construction literally covers *any structure* whatsoever that causes or forces movement. Such a result is fundamentally impermissible under well-established claim construction principles. See

Risdon Iron & Locomotive Works v. Medart, 158 U.S. 68, 79 (1895) ("[A] man cannot have a patent for the function or abstract effect of a machine, but only for the machine that produces it.").  To prevent patentees from using functional definitions to claim any and all possible structures, the courts either interpret the claim under 35 U.S.C. § 112, ¶ 6 to be limited to the structures actually described in the specification, or determine that the ordinary definition of the claim term itself includes a structural component beyond the naked statement of function.  Either way, here "drive member" must include the shaft or shaft-like structure extended beyond the compartment.

> 1.     Drive Member Cannot Be Defined Solely According To Its Function.

35 U.S.C. § 112, ¶ 6 expressly provides that a limitation in an apparatus claim may be claimed as any means for performing a specified function without claiming structure (a so called "means-plus-function" claim), but in such a case the "claim shall be construed to cover the corresponding structure … described in the specification and equivalents thereof."  35 U.S.C. § 112, ¶ 6.  "In construing means-plus-function claim limitations, a court must first define the particular function claimed.  Then, the court must identify 'the corresponding structure, material, or acts described in the specification.'"  Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc., 336 F.3d 1308, 1319 (Fed. Cir. 2003) (internal citations omitted).[23]

_____

[23] The Federal Circuit has held that the failure to use the word "means" in a patent claim creates a presumption that §112, ¶ 6 does not apply.  Phillips, 2004 U.S. App. LEXIS 6758 at *10.  This presumption may, however, be overcome.  Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1318 (Fed. Cir. 1999) (noting that the use of the phrase "means for" is not the only way to invoke §112, ¶ 6); see also Cole v. Kimberly-Clark Corp., 102 F.3d 524, 531 (Fed. Cir. 1996) ("[M]erely because an element does not include the word 'means' does not automatically prevent that element from being construed as a means-plus-function element.")  Here, while the claims at issue do not contain the words "means for," Hu's purely functional definition itself invokes §112, ¶ 6.

Section 112, ¶ 6 mandates that if the Court considers Hu's proposed construction, it must continue beyond his proposed definition's naked statement of function and look to the patent specification to identify the structures it discloses for causing movement by force or compulsion. As discussed above, the '387 patent discloses only one structure for performing that function - a column, shaft or shaft-like structure extending beyond the compartment to force the socket to move.  (See supra § III.A.2.)  Thus, Hu's own definition must be read to require a column, shaft, or shaft-like structure extending beyond the compartment as the structure that performs Hu's function of "causing movement by force or compulsion."  See e.g. Mas-Hamilton Group v. LaGard, 156 F.3d 1206, 1213-15 (Fed. Cir. 1998) (interpreting "lever moving element" and "movable link member" under §112 ¶ 6). [24]

### 2.     Courts Defining "Member" Require Structural Characteristics.

In every case construing claim terms with the term "member", the courts have either construed the term under 35 U.S.C. §112 ¶ 6 to limit the term to the structure contained in the specification as described above, or have determined that the proper definition of the "member" term itself requires structural characteristics.  Easco is unaware of any case where the courts defined a "member" term in a broad functional manner completely devoid of any structural characteristics.  The following are examples of cases in which the courts have defined claim terms including "member" to have specific structural characteristics:

---

[24] Hu wrongly suggests that CCS Fitness supports his functional construction of "drive member."  (See Hu Br. at 17 n. 32.)  As discussed above, the court in CCS Fitness construed member to mean a "beam-like structure that is 'a single unit in a larger whole.'"  CCS Fitness, 288 F.3d at 1366 (noting that "we will generally construe the term to cover all known types of structure that the patent disclosure supports") (citations omitted) (emphasis added).

| Authority | "Member" Term Construed As Having Specific Structure |
|---|---|
| CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1367 (Fed. Cir. 2002) | member: "a beam-like structure that is a single unit in a larger whole" |
| Hemphill v. MCNEIL-PPC, Inc., 25 Fed. Appx. 915, 919 (Fed. Cir. 2001) | core member: "a fairly rigid core member with an annular band or ring at its base that can fit into the band or ring of the outer housing." |
| Colassi v. Cybex Int'l, Inc., No. 02-11909-RWZ, 2004 U.S. Dist. LEXIS 2950, at *4 (D. Mass. Feb. 27, 2004) | rigid planar member: "the part of the deck that is flat, stiff and extends under and adjacent to the upper course of the belt" |
| St. Flyers LLC v. Gen-X Sports, Inc., No. 01 Civ. 9669 (MBM), 2003 U.S. Dist LEXIS 14597, at *22 (S.D.N.Y.  Aug. 19, 2003) | mounting member: "a piece of, or an object attached to, the wheel seat, which extends through one end of the stopping means" |
| Leoutsakos v. Coll's Hosp. Pharm., Inc., No. 02-434-m, 2003 U.S. Dist. LEXIS 12591, at *8 (D. NH. July 8, 2003) | planar plate member: "a perfectly flat sheet of material of uniform thickness throughout" |
| JVW Enters. v. Interact Accessories, Inc., No MJG-00-1867, 2003 U.S. Dist LEXIS 16221, at *4 (D. MD. May 6, 2003) | mounting member: "a platform, frame or support on which a video game controller is mounted by the means specified in the claim" |
| Honeywell, Inc. v. Victor Co. of Japan, Ltd., No. 99-1607 (DWF/AJB), 2003 U.S. Dist LEXIS 7148, at *3 (D. Minn. Apr. 25, 2003) | transparent member: "a structure formed of some transparent medium (through which light might pass unadulterated) and on which are formed more than one lenslet" |
| Bausch & Lomb, Inc. v. Moria S.A., 222 F. Supp. 2d 616, 653 (E.D. Pa. 2002) | channel member: "a groove formed along at least one side of [sic] positioning ring into which a portion of the cutting head assembly fits" |
| Andersen Corp. v. Fiber Composites, LLC, No. 00-2548 (RHK/AJB), 2002 U.S. Dist. LEXIS 6233, *33-34 (D. Minn. Apr. 9, 2002) | composite structural member: "polymer and wood article having load bearing capability, which can be obtained through a direct extrusion process or made from a composite material without a particular form" |
| Scimed Life Sys. v. Johnson & Johnson, 225 F. Supp. 2d 422, 427 (D. Del. 2002) | member: "structural element that has its ends at different longitudinal positions with respect to the stent's longitudinal axis" |
| Engineered Prods. Co. v. Donaldson Co., 165 F. Supp. 2d 836, 875 (N.D. Iowa 2001) | elongated locking member: "a part or piece capable of being locked …which is slender in length relative to width" |
| Kudlacek v. DBC, Inc., 115 F. Supp. 2d 996, 1024 (N.D. Iowa. 2000) | vibration dampener adjustment member:  "comprised of either a single piece or multiple pieces joined together so that the member has openings therethrough that permit the stabilizer rods to pass through the adjustment member and the adjustment member partially or completely encloses the "openings therethrough" |
| Kohus v. Cosco, Inc., No. C-1-97-968, 1999 U.S. Dist. LEXIS 23010, at *14 (S.D. Ohio Aug. 17, 1999) | frame member: "consists of a corner support casing, which is attached to the second end of a floor support bar and also to an enclosure support bar and a latch means" |
| Jepson v. Egly, 231 F.2d 947, 950 (C.C.P.A. 1956) | drive member: "the shaft which drives one of the rollers." |
| Quigley v. Zimmerman, 22 C.C.P.A. 713, 715 (C.C. P.A. 1934) | using the term "flexible drive shaft" interchangeably with the term "flexible drive member" |

These cases demonstrate that when required to construe a claim containing the term "member", courts identify specific structural characteristics and do not construe the term to mean merely a constituent part of an apparatus that performs a given function. Whether thus viewed as the ordinary and customary meaning of "drive member" to one skilled in the art as under Easco's proposed structural construction, or as the functional definition advocated by Hu but further interpreted under Section 112, ¶ 6 as required by law, either analysis leads to the same result – "a shaft or shaft-like structure extended beyond the compartment."

## IV.   "MOUNTED"

### A.   The Claim Language And Specification Utilize "Mounted" As Meaning "Attached To." Or "Held In Position".

Easco proposes construing the term "mounted" as either "attached to" or "held in position."  (See Ex. B.)  The patent claims and specification consistently employ these meanings. See Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp., 309 F.3d 1365, 1371 (Fed. Cir. 2002) (holding that a claim term used in multiple claims in the same patent should be construed consistently).  For example, Claim 1 discloses "...a ring *mounted* in the compartment *and around* the first end of the drive member ...."  ('387 patent, col. 8, ll. 13-14.)  Figure 2 illustrates the relationship of these associated parts – ring (**40**) is secured in the wrench so it is in the compartment (**13**) around the first end (**22**) of the drive member (**20**).



Fig. 2

Without being secured or connected in some fashion the ring would not remain in this specific

relationship to the other components.  All uses of the term "mounted" in the '387 patent claims

similarly require the particular components to be connected, secured, or joined in some way in

order to remain in specific association with other parts:

| '387 patent claim | Usage (emphasis added) |
|---|---|
| Claim 1 | "… the gear wheel being rotatably *mounted in* the compartment …" |
| Claim 1 | "… a pawl *mounted in* the compartment and including a first side with a plurality of second teeth facing the first teeth of the gear wheel …" |
| Claim 1 | "…a reversing plate *mounted to* the first end of the drive member …" |
| Claim 6 | "… the reversing plate contains a hole so as to be pivotally *mounted around* the first end of the drive member and pivotable about the rotational axis of the gear wheel…" |
| Claim 9 | "… the reversing plate including an arcuate groove communicated with the receptacle, a pin being securely *mounted in* the arcuate groove …" |
| Claim 10 | "… the retaining means includes a U-shape slide piece with two limbs and an elastic member *mounted between* the limbs of the slide piece …" |
| Claim 17 | "… a rotatably *mounted* drive member including a gear wheel …" |
| Claim 22 | "…with the pawl *mounted in* a compartment section defined by a wall, with the pawl being moveable in a radial direction relative to the drive member …" |
| Claim 24 | "…with the drive member being rotatably *mounted about* a rotational axis …" |

The patent specification also repeatedly and consistently uses "mounted" to require some

form of connection or joining to maintain the association of certain parts:

| '387 patent specification | Usage (emphasis added) |
|---|---|
| Summary Of The Invention (col. 2, ll. 32-34) | "… a pawl *mounted in* the compartment and including a first side with a plurality of second teeth facing the first teeth of the gear wheel …" |
| Summary Of The Invention (col. 2, ll. 40-41) | "… a ring *mounted in* the compartment *and around* the first end of the drive member …" |

| Summary Of The Invention (col. 2, ll. 47-48) | "…a reversing plate *mounted to* the first end of the drive member …" |
| '387 patent col. 4, ll. 16 | "Rotatably *mounted in* the head **12** is a drive member **20**…" |
| '387 patent col. 4, ll. 28-29 | "[s]till referring to FIGS 1, 2, and 6, a pushpin **25** is *mounted* in the through-hole **24** of the drive member **20** …." |
| '387 patent col. 4, ll. 59-60 | "Still referring to FIGS. 1, 2, and 6, a ring **40** is pivotally *mounted around* the upper end **22** of the drive member **20**." |
| '387 patent, col. 5, ll. 1-2 | "A reversing plate **50** is *mounted* around the upper end **22** of the drive member **20** …" |

Using "mounted" to require such connecting or joining to maintain the relationship or position of parts is consistent with its dictionary definition. See McGraw-Hill Dictionary of Scientific and Technical Terms 1377 (6th ed.) (defining "mount" in relevant part as "to fasten an apparatus in position"). (See Ex. E.)  However, these various forms of connection and association of parts are also summarized and encompassed by the ordinary and easily understood term "attach." See American Heritage® Dictionary of the English Language 1-2 (4th ed. 2002) (defining attach as: "to fasten, secure, or join; to connect as an adjunct or associated condition or part"). (See Ex. O.)  Easco therefore, proposes the simpler construction of "attached to" as the ordinary meaning of the term "mounted" as used in the claim language itself. (See Ex. B.)  If however, the Court believes that the summary term "attach" introduces ambiguity, Easco also proposes the alternate construction: "held in position." (See Ex. B.)  This more specific alternative is from the technical dictionary, see McGraw-Hill Dictionary of Scientific and Technical Terms at 1377 (see Ex. E), and also comports with the patent's various uses of "mounted."

Hu attacks Easco's proposed construction as excluding the preferred embodiment, claiming an "attached" pawl would not be free to move back and forth. (See Hu Br. at 22.)  Hu's allegation is incorrect.  The term "attach" does not mean immovable.  See American Heritage®

Dictionary of the English Language. (See Ex. O.)  Furthermore, Hu himself discloses that a

component of his invention can be attached (i.e., connected) and still have movement.  (See '387

patent, Claim 7 ("a ring mounted in the compartment and around the first end of the drive

member, the ring being operably *connected to* the pawl *such that* the ring and pawl are *pivotable*

*about a rotational axis* …." (emphasis added).)  Again, however, if the Court has any concerns

about the summary term "attached to," it should adopt the direct technical definition and Easco's

alternative construction, "held in position."

**B.    Hu's Proposed Construction Renders "Mounted" Superfluous.**

Hu proposes construing "mounted" as "put into position to use."  (See Ex. B.)  This

proposed construction renders the claim term "mounted" superfluous and irrelevant.  For

example, Claim 22, states in relevant part, "with a pawl mounted in a compartment." ('387

patent, col. 10, ll. 32-33.)  Adopting Hu's construction would result in the claim reading "with a

pawl put into position for use in a compartment" which is synonymous with simply saying "with

a pawl in a compartment," thus making the term "mounted" superfluous.  Hu's proposal,

therefore, should be rejected. See e.g. Elekta Instr. S.A. v. O.U.R. Scientific Int'l, Inc., 214 F.3d

1302, 1307 (Fed. Cir. 2000) (rejecting construction rendering a term superfluous).  "In

interpreting the scope of claims, courts should endeavor to give meaning to each claim term."

Pfund v. U.S., 831 F.2d 1017 (Fed. Cl. 1998) (citing Tandon Corp. v. U.S. ITC, 831 F.2d 1017,

1023 (Fed. Cir. 1987).  The Court should adopt either of Easco's proposed constructions and

reject Hu's superfluous construction.

V.     "BEARING"

   A.     **The Intrinsic Evidence Discloses A Reactive Force Created When The Pawl "Bears" Against A Point.**

   Easco proposes construing the term "bearing" to mean "touching sufficient to create a reactive force."  (See Ex. B.)  Neither the claim language nor technical dictionaries applicable in this context define "bearing."  In ordinary English, "bearing" is defined as "to exert pressure, force or influence."  American Heritage® Dictionary of the English Language 2 (4th ed. 2002) (See Ex. O.)  The patent specification supports this ordinary meaning of "bearing" as requiring the exertion or creation of force.  Specifically, the '387 patent describes the engagement between a gear wheel and a pawl when the pawl is "bearing" against a point of the wall:

> The reactive force by the wall at point A is imparted into an upward vertical force FN1 and a rightward horizontal force FN2. The upward vertical force FN1 makes the pawl 81 move toward the gear wheel 80 and the rightward horizontal force FN2 moves the pawl 81 rightward As a result, the pawl 81 and the gear wheel 80 have a firm engagement with each associated tooth of the gear wheel at point D.

('387 patent, col. 1, ll. 53-56; Fig. 8.)[25]  The specification thus teaches that a reactive force is created when the pawl "bears" against a point in the wall.  Easco's construction, "touching sufficient to create a reactive force" reflects this description in the specification.

   B.     **Hu Ignores The Intrinsic Evidence And Proposes A Vague And Ambiguous Construction.**

   In contrast, Hu's construction ignores the intrinsic evidence.  Hu's proposed construction is "pressing or pushing against."  (See Ex. B.)  Hu ignores the patent language by neglecting to

---

[25] This discussion is included in the Description of the Related Art section of the '387 patent and makes reference to a conventional ratcheting tool.  (See '387 patent col. 1, ll. 50-60.) According to the patent, this discussion is equally applicable to the engagement between a pawl and gear wheel of Hu's alleged invention.  (See e.g. '387 patent, col. 5, l. 67 – col. 6, l. 4 ("The other side of the pawl **30** facing away from the teeth **31** *bears* against a wall portion defining the second compartment section **132**.  Thus, the teeth **31** of the pawl **30** is [sic] *forced to engage* with the teeth **211** of the gear wheel **21** of the drive member **20** …."); '387 patent, Fig. 4A.)

include an element of force in his construction. The specification describes a reactive force – it does not just describe, or even use the terms, "pressing" or "pushing" when discussing the engagement of the pawl and the gear wheel. (See '387 patent col. 5, l. 64 – col. 7, l. 19.) More importantly, by ignoring the context in which the term "bearing" is used in the specification, Hu proposes a construction as vague and ambiguous as the term he attempts to construe.

Hu alleges that Easco's proposed construction is ambiguous because of the use of the term "reactive force," (see Hu Brief at 24–25), however, as noted above, this phrase appears in Hu's own specification. This patent language is more definitive than the ambiguous terms "pressing" and "pushing" used in Hu's proposed construction. Easco's construction is consistent with the specification that Hu ignores, and the Court should adopt Easco's proposal.

## VI. <u>CONCLUSION</u>

Easco respectfully requests that its proposed constructions of the terms "ratcheting tool," "drive member," "mounted," and "bearing" be adopted, in accordance with their ordinary meanings to a person skilled in the art as shown by the claim language, specification, and prosecution history of the '387 patent.

Respectfully Submitted,


**PLAINTIFFS: EASCO HAND TOOLS, INC.,
ARMSTRONG TOOLS, INC., KINGSLEY
TOOLS, INC., LEA WAY HAND TOOL
CORPORATION and MATCO TOOLS
CORPORATION**



By _____

      Francis H. Morrison (ct 04200),
      *fhmorrison@dbh.com*
      Matthew J. Becker (ct 10050)
      *mjbecker@dbh.com*
      Day, Berry & Howard LLP
      CityPlace I
      Hartford, Connecticut  06103-3499
      Telephone:  (860) 275-0100
      Fax:  (860) 275-0343
      Attorneys for Plaintiffs

-41-

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of Plaintiffs' Memorandum Regarding Claim Construction is being served via overnight mail, postage prepaid, this 30th day of April, 2004 to:

J. Hoke Peacock III
Randall W. Wilson
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096

David B. Zabel
Cohen and Wolf, P.C.
1115 Broad Street
Bridgeport, CT  06604

Michael F. Heim
Jonathan Pierce
Conley, Rose & Taylor, P.C.
600 Travis Street, Suite 7100
Houston, TX  77002


_____
Francis H. Morrison