United States District Court
District of Connecticut
FILED AT HARTFORD
6/24/04
Kevin F. Rowe, Clerk
By A. Montgomery
Deputy Clerk

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

EASCO HAND TOOLS, INC.,                   :   CIVIL ACTION NO. 3:02 CV 1723 (AVC)
ARMSTRONG TOOLS, INC.,                    :   Consolidated with Civil Action No. 3:02 CV
KINGSLEY TOOLS, INC., LEA WAY             :   1747 (AVC)
HAND TOOL CORPORATION and                 :
MATCO TOOLS CORPORATION                   :
                                          :
            Plaintiffs,                   :
                                          :
vs.                                       :
                                          :
HU, HOU-FEI a/k/a BOBBY HU                :
                                          :
            Defendant.                    :   June 16, 2004

### PLAINTIFFS' SUR-REPLY IN FURTHER SUPPORT OF THEIR PROPOSED
### CLAIM CONSTRUCTION

The central difference between the parties' proposals boils down to the standard the

Court must employ in identifying the proper construction of the claim terms in the '387 patent.

Easco seeks to apply the long-standing rules of construction requiring that a term be given a

precise definition: (1) in accordance with its customary meaning understood by those skilled in

the relevant technical art, here tool design, (2) "most consistent" with the use of the term in the

patent and intrinsic evidence, and (3) limited to definite physical structures and not purely

functional concepts.  Consistent with these principles, Easco proposes construing "drive

member," for example, as "a shaft or shaft-like structure extended beyond the compartment."

This specific structural definition, grounded in multiple tool design technical authorities, is most

consistent with each and every use of "drive member" in the '387 patent and intrinsic evidence.

Defendant Hu, in contrast, abandons all three of these principles and seeks to divorce

"drive member" from its technical tool design context.  Hu does not even claim that his proposed

construction, "a constituent part of any structural unit or composite whole that causes something to move by force or compulsion in a direction" satisfies these principles. Instead, Hu attempts, unsuccessfully, to explain away his departure from all three. First, Hu does not contend that his construction is the ordinary and customary meaning known to those skilled in tool design, but argues, without support, that "drive member" is not a technical term. Second, Hu does not contend that he has identified the best definition "most consistent" with the '387 patent and its specification, but argues, incorrectly, that he need not do so because this long-held claim construction requirement has recently changed. Lastly, Hu does not limit his proposal to any defined structure, thereby improperly extending the term's coverage to anything that forces something else to move, but baldly claims no specific structures are required. All three of Hu's "explanations" are legally erroneous. None can support a proper claim construction. All three should be rejected.

## I.     HU'S PROPOSED CONSTRUCTION IS NOT THE ORDINARY AND CUSTOMARY MEANING TO ONE SKILLED IN THE ART OF TOOL DESIGN.

Hu does not assert, let alone establish, that his proposed constructions reflect the ordinary and customary meanings to those skilled in the relevant technical art of tool design. Hu instead offers broad, general usage definitions for each of the component words of the claim terms at issue. (See Hu Reply Br. at 4-5, 7.) Attempting to rationalize this approach, in regard to "drive member" Hu states that "drive" "is not a technical term requiring the use of a 'technical' dictionary." (See id. at 7.) Hu provides no factual support for this inaccurate assertion, proffering only a misplaced citation to Novartis Pharmaceuticals Corp. v. Eon Labs Manufacturing Co., 363 F.3d 1306 (Fed. Cir. 2004). (Id.) In Novartis, the court turned to general purpose dictionaries because neither party suggested that the term at issue, "hydrosol,"

-2-

had any specialized meaning separate from the general dictionaries. Novartis, 363 F.3d at 1309.[1]
Here in contrast, Easco, relying on two separate technical dictionary treatises, has established
that "drive" has a highly specialized meaning when used in tool design.  (Easco Br. at 18-20.)

Hu has no response to Easco's primary technical treatise, the TAB Handbook of Hand
and Power Tools (Easco Br. at 18), establishing the tool design-specific definition of "drive".
(See generally Hu Reply Br.)  Hu does not claim that its definition is erroneous or inapplicable
to the '387 patent, and simply turns a blind-eye to it.  (See id.)  Regarding Easco's second
source, the Dictionary of Automotive Terms, Hu merely contends that in addition to its definition
No. 9 expressly directed to the tool context, it also has several definitions directed to driving a
car (definitions nos. 1-6), including turning a steering wheel or shaft (definition 3).  (See id. at 7-
8.)[2]  Importantly, Hu does not, and cannot, claim that the car driving definitions are more
relevant to the tool design context of the '387 patent than the definition expressly involving
tools.  (See id. at 8 (quoting definition no. 9 "a tool which has a square end . . . .").)  (See, infra,
§ II (claim construction requires choosing the definition most consistent with the patent).)  Thus,
Hu does not contest the applicability of Easco's tool design treatises or their definitions.

As a matter of law, therefore, Hu cannot use any general usage dictionary definitions to
trump Easco's established technical definitions.  Just last month the Federal Circuit held that
where such technical dictionaries and treatises evidence that "artisans would attach a special

---

[1]  Hu makes the same argument with regard to "ratchet" and "tool" not being technical terms. (Hu Reply
Br. at 4-5.)  There, in addition to Novartis, Hu miscites other cases where no technical definition was proffered for
the terms at issue.  See Int'l Rectifier Corp. v. IXYS Corp., 361 F.3d 1363, 1370-71 (Fed. Cir. 2004)("The parties do
not advance any other dictionary definition, nor do the alternative definitions in the dictionary pertain even
superficially to the issue at hand.");  Gart v. Logitech, Inc., 254 F.3d 1334, 1343 (Fed. Cir. 2001)("We adopt the
ordinary definitions of the terms 'wrapped' and 'flexion,' . . . proffered by Gart because they are standard dictionary
definitions that Logitech does not dispute.").  Such is not the case here.

[2]  It should come as no surprise to Hu that an automotive dictionary includes steering a car amongst its
definitions of driving.

meaning to a claim term" then "general-usage dictionaries are rendered irrelevant with respect to

that term . . . ". <u>Vanderlande Industries Nederland BV v. ITC</u>, 36 F.3d 1311, No. 03-1349, 2004

U.S. App. LEXIS 8655, *22 (Fed. Cir. May 3, 2004) (emphasis supplied; copy attached as Ex.

A). <u>See also</u> <u>Texas Digital Sys., Inc. v. Telegenix, Inc.</u>, 308 F.3d 1193, 1206 (Fed. Cir. 2002)

(requiring the use of "<u>relevant</u> dictionaries, encyclopedias and treatises" in claim construction

(emphasis supplied)). "[A] general-usage dictionary cannot overcome credible art-specific

evidence of the meaning ... of a claim term." <u>Vanderlande</u>, 2004 U.S.App. LEXIS 8655, at

*22.[3]

Easco is the only party that proposes a construction that is the ordinary meaning of "drive

member" to those skilled in the relevant art of tool design. Hu has not done so, and does not

claim otherwise. As a result, Hu's proposed construction has no relevance to the '387 patent or

its tool design context, and it must be rejected.

## II.     EASCO'S PROPOSED CONSTRUCTION OF "DRIVE MEMBER" IS THE DEFINITION MOST CONSISTENT WITH THE INTRINSIC EVIDENCE OF THE '387 PATENT SPECIFICATION.

### A.     *Texas Digital* Did Not Change The Rules Of Claim Construction And Courts Still Must Identify The Ordinary Meaning Of Claim Terms Within The Context Of A Patent's Intrinsic Evidence.

Rather than proposing a construction matching the ordinary meaning to one skilled in the

art of tool design, Hu searches amongst all available definitions (both from his general usage

dictionaries, and now one of Easco's technical dictionaries) for the broadest definitions of

"drive" and "member", and argues his patent reaches to cover all such definitions not expressly

---

[3] Hu does observe correctly that Easco's proposed construction for "drive member" is based on the relevant technical definitions of "drive" and "member", rather than quoting them all verbatim. (Hu Reply Br. at 9.) This is entirely appropriate. <u>See, e.g.,</u> <u>ADE Corp. v. KLA-Tencor Corp.</u>, 252 F. Supp. 2d 40, 55-56 (D. Del. 2003) (rejecting plaintiff's argument that when construing the term "oblique zone" the court had to assess and combine the ordinary meanings of the individual terms "oblique" and "zone"). If the Court, however, is concerned with Hu's objection, Easco is willing to adopt a construction for "drive member" directly quoting any of the extended shaft definitions from the technical treatises.

inconsistent with or disclaimed by the patent specification. (See Hu Reply Br. at 7-8.) Hu

argues that his incorrect approach to construction is justified by the Federal Circuit's 2002

opinion in Texas Digital. (See id. at 2-3, 7-8.) Texas Digital, however, was not as Hu asserts a

"sea change in the law of claim construction" and more importantly does not authorize Hu's

method of construing claim terms to cover all possible dictionary definitions.

     Hu's argument rests on a single line he misreads from the Federal Circuit's opinion in

Texas Digital, 308 F.3d at 1204. (See Hu Reply Br. at 2-3.)  The entire paragraph

encompassing that line shows that Texas Digital does not alter the rules of construction at all.

Both the portions before and after Hu's carefully-selected sentence reaffirm that the goal of

claim construction is, and remains, to choose the specific definition that is most consistent with

the way the inventor actually uses the term in the patent specification:

> Because words often have multiple dictionary definitions, some having no
> relation to the claimed invention, the intrinsic record must always be consulted to
> identify which of the different possible dictionary meanings of the claim terms in
> issue is most consistent with the use of the words by the inventor. ...

> The objective and contemporaneous record provided by the intrinsic evidence is
> the most reliable guide to help the court determine which of the possible
> meanings of the terms in question was intended by the inventor to particularly
> point out and distinctly claim the invention.

Texas Digital, 308 F.3d at 1204-05 (citations omitted; emphasis supplied).

     Even the paragraph's intervening sentence cited by Hu -- "If more than one dictionary

definition is consistent with the uses of the words in the intrinsic record, the claim terms may be

construed to encompass all such consistent meanings." (See Hu Reply Br. at 2-3) -- says nothing

to the contrary.  This line merely states that if the patent specification uses the claim term in

multiple ways, the term should be construed to cover all those ways.[4]  Here, in contrast, the '387

---

[4] Such was the situation in the case Texas Digital cites in support of Hu's chosen sentence, Rexnord Corp.
v. Laitram Corp., where the term in dispute not only had two possible dictionary definitions, but the Summary of

patent specification uses the term "drive member" in only one way - a shaft extended beyond the compartment. (Easco Br. at 20-24.)

Removing any possible doubt, the <u>Texas Digital</u> court concluded its construction discussion making clear that the most relevant sources should be used to find the best definition, and patents should not be read to include all definitions that might be available in a vacuum:

> By examining <u>relevant</u> dictionaries, encyclopedias and treatises to ascertain possible meanings that would have been attributed to the words of the claims by those skilled in the art, and by further <u>utilizing the intrinsic record to select from those possible meanings the one or ones most consistent</u> with the use of the words by the inventor, <u>the full breadth of the limitations intended by the inventor will be more accurately determined</u> and the improper importation of unintended limitations from the written description into the claims will be more easily avoided.

<u>Texas Digital</u>, 308 F.3d at 1206 (emphasis supplied).

Moreover, Hu's approach to <u>Texas Digital</u> has been expressly rejected. "The Court rejects [plaintiff's] effort to focus attention solely on dictionary definitions. . . . <u>Texas Digital</u> did not make them the 'be all and end all' of claim construction or otherwise work a dramatic change in the process of construing claims." <u>ADE Corp. v. KLA-Tencor Corp.</u>, 252 F. Supp. 2d 40, 57 (D. Del. 2003). Indeed, the court took the patent holder to task for simply adding up all arguably possible definitions:

> [Plaintiff] would have this Court first recite a dictionary definition for each word in a contested patent claim phrase, add those definitions together, and adopt the resulting amalgamation as the Court's construction before proceeding to any consideration of the remainder of the intrinsic record. The cases cited by [plaintiff], however, do not require the cataloguing of dictionary definitions before construing disputed claim phrases, nor do they require the adoption of a definition equal to the sum of the individual definitions of the words in a contested phrase.

---

Invention and entire specification described embodiments expressly utilizing <u>both</u> definitions. 274 F.3d 1336, 1343 (Fed. Cir. 2001)(reversing district court's claim construction because "[w]hen the claim language is assessed on its own, and when the written description is examined carefully, one finds that the patentee has described an invention that embraces, through the word 'portion,' structure that may be either 'integral' or 'separate.'").

Id. (holding "the case law demonstrates that claim construction does not conclude with the shutting of a dictionary"). The court cautioned that in proper claim construction, "context is critical and the import of the intrinsic record cannot be ignored." Id. at 59.

> A narrow approach to patent claim construction that focuses on summing dictionary definitions may well lead a court to adopt an inappropriate construction, one that is inconsistent with the pertinent art and the intrinsic record of the patent in suit. That danger is exacerbated when a phrase, rather than a single word, is at issue. The meaning of a phrase is often greater than the sum of the individual words.

Id.

Therefore, no legal basis permits Hu to sum all possible definitions rather than selecting the best definition that is most consistent with the '387 patent and its intrinsic evidence. Easco has chosen the specific technical definition most consistent with the way the patent uses the term "drive member." The '387 patent specification repeatedly discloses the drive member as a shaft with an extended end, and nothing else. (Easco Br. at 20-24.) As the definition most consistent with those uses, Easco's proposed construction of drive member should be adopted.[5]

**B.    Unable To Support His Proposed Construction With Intrinsic Evidence, Hu Abandons _Texas Digital_ And Wrongly Resorts To Extrinsic Evidence.**

Confronted with the fact that the '387 patent specification and intrinsic evidence do not support his broader, general definitions, Hu turns to five extrinsic patents to support his construction of "drive member." (See Hu Reply Br. at 11-13.) These patents were not cited in

---

[5] Hu accuses Easco of misusing the specification when construing "drive member," claiming Easco tries to import a limitation from the preferred embodiment. (Hu Reply Br. at 13-16.)  Hu tries, unsuccessfully, to distinguish the multiple cases Easco cites supporting such uses of a patent's specification, and in particular its Figures and Summary of the Invention, to provide the claims context and select the most consistent definition. (See id.)  Notably, Hu does not cite a single authority where a court ignored the contextual requirements in the specification, and adopted a broader construction as Hu attempts here.  Even more significantly, in his own reply brief Hu turns to the '387 specification and its figures to define the term "ratcheting tool". (Id. at 5.)  Hu's own conduct and lack of supporting authority belie his misplaced accusations.

the prosecution history.[6] Thus, all five constitute extrinsic evidence, and should not be relied upon by the Court.  As a general rule, a court should never rely on extrinsic evidence such as art beyond that cited in the prosecution history. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996).  Extrinsic evidence is to be used only as a last resort because the intrinsic evidence of a patent constitutes the public record on which the public is entitled to rely. Id. Extrinsic evidence may be considered only if a claim remains ambiguous after consulting all the intrinsic evidence of record.  Id.  There are no ambiguities in the term "drive member" that would require a court to resort to extrinsic evidence, and Hu does not claim otherwise.  Instead, the '387 patent specification and the relevant technical dictionaries and treatises unambiguously support Easco's proposed construction of a shaft or shaft-like structure extended beyond the compartment.

Even if considered, however, these patents provide no support for Hu's proposed construction.  None of them employ such a broad definition of "drive member."  They show situations where inventors, mostly Hu himself, acted as their own lexicographer and specifically redefined "drive member" as a gear wheel.  (See '068 patent, col. 3, ll. 45 – 46 ("[i]n this embodiment, the drive member 20 is in the form of a gear wheel"); '779 patent, col. 3, ll. 49-52 ("[a] drive member (in the form of a gear wheel 30 in this embodiment)"); '825 patent, col. 3, ll. 10-11 (same); '477 patent col. 2, l. 64 – col. 3, l. 1 ("[a] driving member 30 ... having an inner wall defining a plurality of driving groves 31 and an outer wall").)[7]  Easco previously noted that

---

[6] Easco acknowledges that the applications from which three of the patents issued (the '068, '779, and '825 patents) were cited in the prosecution history. Hu, however, relies not on the applications but on the patents which issued from them.

[7] The fifth patent, the '140 patent, in fact discloses a ratchet wrench that is not a typical ratchet wrench. The drive member is a separate component that "clips" into the gear wheel. Even here, however, the drive member is specifically defined, and notably depicts one or more driving stems and/or socket extended therefrom, for engaging with various kinds of fasteners or tool extensions. ('140 patent, col. 2, ll. 43-47, figs. 4 and 5). This reference, if anything, supports Easco's construction, not Hu's.

Hu had done this in other patents actually cited in the '387 patent's prosecution, namely the '991 and previously asserted but now dropped '992 patents. (Easco Br. at 28-30.) In stark contrast to those references and to Hu's extrinsic references, Hu chose not to do so in the '387 patent. There is not even a hint in the '387 patent specification – neither in the figures nor the text – that would lead a person of ordinary skill in the art to conclude that the term "drive member" is a gear wheel or anything other than its customary technical meaning of a shaft extended beyond the compartment. Because the '387 patent does not redefine "drive member," these extrinsic "gear wheel" examples cannot be most consistent with the way the '387 patent specification actually uses the term "drive member."

Additionally, Hu's strained attempt to have the Court base its construction of "drive member" in the '387 patent on the term's use in other patents would lead to an absurd result. None of the claims in the extrinsic patents separately claim a "gear wheel" in addition to the "drive member." The '387 patent, however, separately states both terms: "a drive member including a gear wheel." ('387 patent, claim 17.) Thus, if the term "drive member" were construed to mean only a gear wheel, then claim 17 would read nonsensically: a gear wheel including a gear wheel. The phrase "drive member including" would be superfluous and redundant. Hu's proposed construction, therefore, should be rejected. See, e.g., Eleckta Instr. S.A. v. O.U.R. Scientific Int'l, Inc., 214 F.3d 1302, 1307 (Fed. Cir. 2000) (rejecting construction rendering a term superfluous).[8]  Any definition causing such a redundancy also cannot be the definition most consistent with the way the words are actually used in the patent.

---

[8] Hu concedes that the '387 references to "drive member" call for a shaft with an elongated end, but argues that claim 1 relates to all of those descriptions by claiming a drive member with ends extended beyond the compartment, and that asserted claim 17 is different because it does not specify such ends. (Hu Reply Br. at 9-11.) Hu apparently argues that claim 17 and its "drive member" have no basis in the specification. If true, the claim would fail for lacking an adequate written description. See 35 U.S.C. § 112, 1.

### III.    HU CANNOT IGNORE THE LEGAL REQUIREMENT THAT "DRIVE MEMBER" BE LIMITED TO SOME DEFINED STRUCTURE.

Regardless of which dictionaries are relevant, and which parts of the '387 patent specification are found controlling, the term "drive member" cannot be construed as Hu claims to cover "a constituent part of any structural unit or composite whole that causes something to move by force or compulsion in a direction". (Hu Brief at 15.) This construction lacks any limitation to specific structures, and indeed would literally cover any part of anything that causes anything else to move. Such a purely functional description is impermissible as a matter of law. See, e.g., Vanderlande, No. 03-1349, 2004 U.S. App. LEXIS 8655, *22-23 (Fed. Cir. May 3, 2004) (rejecting proposed definition of "a device for facilitating the movement of something" because it is "vague, abstract and fails to connote a particular structure").

35 U.S.C. §112, 6 forbids Hu from directly writing such a purely functional definition in place of the words "drive member" into the claim language itself. (Easco Br. at 31-35.) Hu's only response merely states that the claim language itself does not contain a functional definition. (Hu Reply Br., at 16-17.) Hu misses the point, and provides no authority permitting him to do indirectly through claim construction what, Hu apparently concedes, was prohibited directly in claim drafting.

Likewise, in its opening brief, Easco cited 15 separate decisions construing the term "member" as requiring some definite structure. Hu attempts a response to only two. (Hu Reply Br. at 17.)  Furthermore, Hu's effort to distinguish each of these fails. Hu argues that CCS Fitness Inc. v. Brunswick Corp., 288 F.3d 1359 (Fed. Cir. 2002), construed the term "member" to be a structural unit such as a beam or tie or a distinct part of a whole. (See Hu Reply Br. at 17 (emphasis added).) In actuality, the court construed "member" to be "a beam-like structure that is a single unit in a larger whole." CCS Fitness, 288 F.3d at 1367. Similarly, in trying to rebut

Easco's use of <u>Engineered Products Co. v. Donaldson Co.</u>, 165 F. Supp. 2d 836 (N.D. Iowa 2001), Hu leaves out a portion of that court's construction of "member." (<u>See</u> Hu Reply Br. at 17.) The <u>Engineered Products</u> court did hold that "member" is a part or piece, but also required defined structural characteristics, namely that the member be slender in length relative to its width. 165 F. Supp. 2d at 875. Therefore, neither case adopted a purely functional definition and only by misstating the courts' constructions can Hu argue to the contrary. In fact, Hu provides no case defining "member", or a compound term including "member," in purely functional terms such as those he advocates here.

Hu's only other response notes that Easco claims that either "drive" means shaft or "member" means shaft, and argues that if both words mean shaft they would be redundant. (Hu Reply Br. at 9.) Hu then commits a logical fallacy, arguing that because both words cannot mean shaft, that neither one means shaft. (<u>Id.</u>) Hu again misses the point. Regardless of how each word is read[9], Hu may not read any and all specific structures out of the entire term. <u>See</u> <u>Vanderlande</u>, 2004 U.S. App. LEXIS 8655, *22-23.

---

[9] "Drive member" is a compound term denoting a shaft or shaft-like structure with extended ends as defined in the technical tool design treatises and described in the '387 specification. It can be viewed as a compound noun having that meaning, as the verb "drive" describing what the member shaft does and how it moves, or as "drive" meaning shaft and "member" meaning simply structure. "Drive" and "member" thus compliment and do not conflict with each other.

## **CONCLUSION**

For all of the above reasons, the Court should reject Hu's proposed constructions and adopt Easco's.

Respectfully Submitted,

PLAINTIFFS: EASCO HAND TOOLS, INC.,
ARMSTRONG TOOLS, INC., KINGSLEY TOOLS,
INC., LEA WAY HAND TOOL CORPORATION
and MATCO TOOLS CORPORATION

By _____

Francis H. Morrison (ct 04200),
*fhmorrison@dbh.com*
Matthew J. Becker (ct 10050)
*mjbecker@dbh.com*
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut  06103-3499
Telephone:  (860) 275-0100
Fax:  (860) 275-0343
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of Plaintiffs' Sur-reply is being served via overnight mail, postage prepaid, this 16th day of June, 2004 to:

J. Hoke Peacock III
Randall W. Wilson
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096

David B. Zabel
Cohen and Wolf, P.C.
1115 Broad Street
Bridgeport, CT 06604

Michael F. Heim
Jonathan Pierce
Conley, Rose & Taylor, P.C.
600 Travis Street, Suite 7100
Houston, TX 77002

Matthew J. Becker

Exhibit

A

LEXSEE 2004 US APP. LEXIS 8655

VANDERLANDE INDUSTRIES NEDERLAND BV and VANDERLANDE
INDUSTRIES, INC., Appellants, v. INTERNATIONAL TRADE COMMISSION,
Appellee, and SIEMENS DEMATIC CORP. and RAPISTAN SYSTEMS ADVERTISING
CORP., Intervenors.

03-1349

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

366 F.3d 1311; 2004 U.S. App. LEXIS 8655

May 3, 2004, Decided

**PRIOR HISTORY:** [*1] Appealed from: United States International Trade Commission.

**DISPOSITION:** AFFIRMED..

**LexisNexis(R) Headnotes**

**COUNSEL:** John M. DiMatteo, Willkie Farr & Gallagher LLP, of New York, New York, argued for appellants. With him on the brief were Art C. Cody and Mary M. Manning.

Michael K. Haldenstein, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for appellee. With him on the brief were Lyn M. Schlitt, General Counsel and James M. Lyons, Deputy General Counsel.

Terence J. Linn, Van Dyke, Gardner, Linn & Burkhart, L.L.P., of Grand Rapids, Michigan, argued for intervenors. With him on the brief was Daniel Van Dyke. Also on the brief were V. James Adduci II and Sarah E. Hamblin, Adduci Mastriani & Schaumberg, L.L.P., of Washington, DC. Of counsel were Jerry B. Blackstock and Leslie B. Zacks, Hunton & Williams LLP, of Atlanta, Georgia; W. Scott Creasman, Powell, Goldstein, Frazer & Murphy LLP, of Atlanta, Georgia; and Steven E. Adkins, Adduci, Mastriani & Schaumberg, L.L.P., of Washington, DC.

**JUDGES:** Before MICHEL, GAJARSA, and LINN, Circuit Judges.

**OPINIONBY:** MICHEL

**OPINION:** MICHEL, Circuit Judge.

Vanderlande Industries Nederland BV and Vanderlande Industries, [*2] Inc. appeal the decision of the United States International Trade Commission ("ITC") holding that the two companies violated section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, by, inter alia, importing for sale in the United States sortation systems that fell within claims 1 and 4 of U.S. Patent No. 5,127,510 ("'510 patent"). In the Matter of Certain Sortation Sys., Parts Thereof, and Prods. Containing Same, USITC Investigation No. 337-TA-460 (Feb. 19, 2003) ("Comm'n Op."); (Oct. 22, 2002) ("ALJ Op."). Appellants challenge the TC's rulings on infringement (including claim construction) and on equitable estoppel. We affirm.

BACKGROUND

I. Private Parties

Appellant Vanderlande Industries Nederland BV is a Netherlands corporation with its principal place of business in the Netherlands. Vanderlande Industries Nederland BV designs and manufactures sortation systems (explained infra) and sortation-system components in the Netherlands, and exports these products to the United States or sells the products for export to the United States.

Appellant Vanderlande Industries, Inc. is a Delaware corporation with its principal place of business [*3] in Marietta, Georgia. Vanderlande Industries, Inc. imports, sells, and installs in the United States sortation systems and sortation-system components manufactured by Vanderlande Industries Nederland BV.

Intervenor Siemens Dematic Corp. is a New York corporation with its principal place of business in Grand Rapids, Michigan. Siemens manufactures and sells sortation systems in the United States. Siemens is the exclusive licensee of the '510 patent.

Intervenor Rapistan Systems Advertising Corp. is a

366 F.3d 1311; 2004 U.S. App. LEXIS 8655, *3

Delaware corporation with its principal place of business in Grand Rapids, Michigan. Rapistan is a wholly-owned subsidiary of Siemens. Rapistan is the owner by assignment of the '510 patent.

## II. Procedural History

On June 25, 2001, Siemens and Rapistan (together, "Siemens/Rapistan") filed a complaint with the ITC pursuant to section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, asserting that Vanderlande Industries Nederland BV and Vanderlande Industries, Inc. (together, "Vanderlande") had engaged in unfair methods of competition and unfair acts in violation of the statute. In particular, Siemens/Rapistan alleged that "in connection with the importation, [*4] sale for importation, and sale within the United States after importation of certain sortation systems, parts thereof, and products containing same that are manufactured by Vanderlande," ALJ Op. at 2, Vanderlande had infringed twenty-seven claims of the '510 patent.

On July 19, 2001, the ITC issued a notice of investigation that was subsequently published in the Federal Register on July 25, 2001. 66 Fed. Reg. 38741 (July 25, 2001). On May 16, 2002, an ITC administrative law judge ("ALJ") issued an initial determination that terminated the investigation with respect to twelve of the asserted claims, leaving fifteen claims for adjudication. This initial determination subsequently became a final ITC determination. On June 4-17, 2002, the ALJ held an evidentiary hearing on the remaining issues in the investigation. On October 22, 2002, the ALJ issued an initial determination holding, inter alia, that: (1) Vanderlande had infringed claims 1 and 4 of the '510 patent, (2) Vanderlande had not infringed the remaining asserted claims of the '510 patent, and (3) Siemens/Rapistan was not equitably estopped from asserting the '510 patent against Vanderlande.

On December 11, 2002, the [*5] ITC issued a notice of its decision to review, at the commission level, the ALJ's rulings on two issues: (1) the construction of a term found in independent claim 30 and dependent claims 33 and 35, and (2) equitable estoppel. With the exception of these two issues, the ALJ's determinations were adopted by the commission and thus became final ITC determinations. On January 27, 2003, the ITC issued a notice of violation of section 337 and a limited exclusion order. The notice of violation indicated that the commission had decided to modify the ALJ's analyses of the two issues on review, but that the commission had reached the same ultimate conclusions on these issues, i.e., noninfringement and no equitable estoppel. The limited exclusion order applied to "sortation systems,

and shoes and slats thereof, covered by claims 1 or 4 of U.S. Patent No. 5,127,510 that are manufactured abroad and/or imported by or on behalf of Vanderlande" with the exception of "sortation system parts for use as spare parts at the [United Parcel Service] Hub 2000 facility in Louisville, Kentucky." n1 On February 19, 2003, the ITC issued the commission's opinion, which provided a more detailed explanation [*6] of the January 27, 2003 notice of violation and limited exclusion order.

> n1 The exception related to the "Hub 2000" facility — which both Vanderlande and Siemens/Rapistan were involved in constructing — was based on Siemens/Rapistan's written representations to the United Parcel Service that "this litigation will have no adverse impact on the Hub 2000 facility" and that "spare parts would continue to flow as needed." ALJ Op. at 302.

Vanderlande timely appealed to our court, which has jurisdiction pursuant to 28 U.S.C. § 1295(a)(6). We heard argument on March 5, 2004.

## III. Nature of the Technology

This case addresses "sortation systems," mechanical equipment used to sort items. The typical sortation system has a main conveyor belt and a number of spurs that branch off the main belt; the parties liken a conveyor belt and its spurs to a highway and its off-ramps. In "positive-sorter" systems, certain devices mechanically push items off the main conveyor belt onto the appropriate [*7] spur. At issue in this case are "shoe-type" positive sorters. In a shoe-sorter system, the main conveyor belt is made up of a series of "slats," and a "shoe" (or "diverter shoe") rides on top of each slat. The shoes mechanically push items across the slats and onto the appropriate spur.

One difficulty with shoe sorters is that when a shoe pushes an item along the slat, the item generates forces that react against the shoe. These reaction forces tend to flip the shoe over and to rotate the shoe sideways. The patent-in-suit, the '510 patent, discloses technology designed to minimize the effects of these reaction forces and promote ease of glide of shoes across slats.

## IV. '510 Patent

The title of the '510 patent is "Modular Diverter Shoe and Slat Construction." The specification of the '510 patent states:

### BACKGROUND OF THE INVENTION

This invention relates to a conveyor

366 F.3d 1311; 2004 U.S. App. LEXIS 8655, *7

sortation system and in particular to a posi-
tive displacement sortation system in which
diverting shoes travelling with the conveyor
surface laterally diverts [sic] packages onto
selected spur lines. . . .

[In shoe-sorter systems,] the diverting
motion applies reaction forces to the shoes
tending to rotate [*8] the shoes about
their vertical axis as well as about the long
axis of the slats. These forces, of course,
increase with heavier packages and those
having a high coefficient of friction with
the slats. These difficulties are aggravated
by a desire to provide ever-increasing line
speeds, which require greater ease of gliding
between the shoe and the slats. Efforts
to provide structural support to resist the
reactive forces tend to be at odds with ease
of glide.

SUMMARY OF THE INVENTION

The present invention provides a sorta-
tion system which is capable of very high
line speeds without excessive line noise by
utilizing unique slats and diverter shoes,
which are capable of rapid and smooth
gliding along the slats while resisting
reactionary forces. . . .

The invention is embodied in a sortation
system in which each of the slats is defined
by a wall having a planar upper portion that
defines the conveyor surface in combination
with diverter shoes having a support portion
including a substantially continuous glide
surface that surrounds the slat and has
substantially the same configuration as the
outer surface of the slat. In a preferred
embodiment, the slat has a parallelogram
cross-section [*9] and bearing means are
defined between at least one edge of each
slat and an engaging portion of the glide
surface of the diverter shoe. The bearing
means is provided by an enlarged radius
surface at the slat edge. Such bearing means
are preferable [sic] provided at diagonally
opposite slat edges in order to better resist
reaction forces about the axis of the slat.

A lateral stabilizing means is addition-
ally provided between each slat and an
engaging portion of the glide surface of the
corresponding diverter shoe in order to resist
vertical axis reaction forces. The lateral

stabilizing means is preferably a T–shaped
outward extension of one potion of the slat
engaging a mating portion of the shoe glide
surface.

'510 patent, col. 1, ll. 9–13, 34–43, 46–50, 56–68, col. 2,
ll. 1–9.

Figures 1–3 and 8–9 from the '510 patent are set out
on the following pages. Figure 1 is a view from above a
sortation system, depicting diverter shoes moving across
slats (from the top of the figure towards the bottom). The
diverter shoes are at 28, and the slats are at 22. Figure
2 is a cross-sectional view of three slats surrounded by
three diverter shoes. Figure 3 depicts a cross-section of
[*10] a single slat, without a shoe surrounding it.
GET DRAWING SHEET 1 OF 6.

Figures 8–9 show different angles of a "support member,"
the bottom part of the diverter shoe. The "diverter
member," the top part of the diverter shoe, is mounted on
the support member; the diverter member is not depicted
in figures 8–9.
GET DRAWING SHEET 4 OF 6.

Claims 1 and 4 state:

1. In a conveying system having a longitu-
dinally moving conveying surface defined
by the uppermost ones of a plurality of slats
connected at opposite ends in spaced relation
with each other to a pair of endless chains;
a plurality of diverter shoes each moveably
mounted on one of said slats for lateral
movement with respect to said conveying
surface; and track means engaging said
diverter shoes for imparting a lateral force
to move said diverter shoes laterally to
displace product positioned on said con-
veying surface, wherein the improvement
comprises:

end of said slats being defined
by a wall formed as a right
cylinder including an outer
surface having a planar upper
portion defining said conveying
surface;

and each of said diverter shoes
having [*11] a support portion
including a substantially contin-
uous glide surface surrounding
said wall, said glide surface
having substantially the same

366 F.3d 1311; 2004 U.S. App. LEXIS 8655, *11

configuration as said outer
surface of said slat.

. . .

4. The conveying system in claim 1 wherein
each of said slats is formed by extrusion.

Id. at col. 6, ll. 6-25, 31-32 (emphases added).

V. Accused Product

The accused product is Vanderlande's Mark 2
Posisorter. The Mark 2 Posisorter is a shoe-sorter
system. The diagram below depicts a cross-sectional
view of the Mark 2 Posisorter's diverter shoe on a slat,
with the candy-striped line indicating the outer boundary
of the slat: n2

[SEE DRAWING IN ORIGINAL]

N2 Vanderlande included this diagram in its
briefs to our court, and the other parties do not
contest the diagram's accuracy.

DISCUSSION

Vanderlande challenges the ITC's determination of
infringement of claims 1 and 4 of the '510 patent and
the ITC's rejection of Vanderlande's defense of equitable
estoppel. In analyzing these [*12] issues, we review
the ITC's factual findings under the substantial-evidence
standard, and we review the ITC's legal determinations
de novo. See, e.g., Honeywell Int'l, Inc. v. Int'l Trade
Comm'n, 341 F.3d 1332, 1338 (Fed. Cir. 2003).

I. Infringement

On infringement, Vanderlande contests the ITC's
infringement analysis of two limitations that are recited
in claim 1 and incorporated by reference in claim 4:
"glide surface surrounding said [slat] wall" and "glide
surface having substantially the same configuration as
said outer surface of said slat."

A. "Glide Surface Surrounding Said [Slat] Wall"

Vanderlande challenges the ITC's construction of the
claim limitation "glide surface surrounding said [slat]
wall." Vanderlande contends that this claim limitation
refers to an inner surface of a diverter shoe that contacts
the outer surface of the slat on all sides. So construed,
Vanderlande does not infringe claims 1 and 4, as it
is undisputed that the inner surface of the Mark 2
Posisorter's diverter shoe only contacts the outer surface
of the slat on three sides, and does not contact the top

of the slat. The ITC rejected Vanderlande's argument as
[*13] to contact, determining that the limitation at issue
actually did not require any contact at all:

The term "glide surface" in claim 1
[and incorporated by reference in claim 4]
is merely a two-dimensional surface and
does not imply any points of contact or non-
contact between the inner surface of the
diverter shoe and the outer surface of the
slat wall. Points of contact or non-contact
between the glide surface and the slat wall
are not claimed features of this element of
claim 1. . . . All that matters to being a "glide
surface," really, is whether the inner surface
of the Mark 2 Posisorter shoe (i) moves
over or along the surface of the slat in a
smooth, effortless manner without pivoting
or rolling; and (ii) is two-dimensional.
There is no factual dispute that the Mark
2 Posisorter shoe's inner surface possesses
these characteristics. Ergo, the inner surface
of the Mark 2 Posisorter constitutes a "glide
surface" as that term is used in claim 1.

ALJ Op. at 120-21.

We review the ITC's claim construction de novo.
Honeywell, 341 F.3d at 1338. We seek to determine what
a person of ordinary skill in the art would understand the
claims to mean "in [*14] light of the intrinsic evidence of
record, including the written description, the drawings,
and the prosecution history, if in evidence." Teleflex, Inc.
v. Ficosa N. Am. Corp., 299 F.3d 1313, 1324 (Fed. Cir.
2002). While extrinsic evidence can shed useful light
on the relevant art — and thus better allow a court to
place itself in the shoes of a person of ordinary skill in
the art — the "intrinsic evidence is the most significant
source of the legally operative meaning of disputed claim
language." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d
1576, 1582 (Fed. Cir. 1996). Indeed, a "court should
look first to the intrinsic evidence of record," id., to
determine if the patentee "expressly defined terms used
in the claims or . . . defined terms by implication," Dow
Chem. Co. v. Sumitomo Chem. Co., Ltd., 257 F.3d 1364,
1373 (Fed. Cir. 2001).

The critical term in the limitation "glide surface sur-
rounding said [slat] wall" is "glide surface," as the parties
agree that the ITC correctly construed "surrounding"
to mean "to extend on all sides; to encircle; to enclose
on all sides to cut off communication or retreat." ALJ
Op. [*15] at 69. The written description's most detailed
discussion of the term "glide surface" is in the context of
the explanation of the preferred embodiment:

Each diverting shoe 28 includes a support member 44 and a diverting member 46 mounted to the support member (FIG. 2). Support member 44 includes a glide portion 48 having a continuous glide surface 50 having substantially the same configuration as the outer surface of slat 22 for gliding movement along the slat. . . . Continuous surface 50 includes a channel 58 surrounding projection 42 of the slat such that the projection rides within the channel (FIGS. 8, 9, and 11). Continuous surface 50 additionally includes a support rib 60 which engages top wall 30 of the slat to support an upper wall 62 of the support member. Continuous surface 50 additionally includes an enlarged radius forward upper corner 64 and an enlarged radius lower rear corner 66, in which enlarged radius corners 38 and 40 of the slat, respectively, ride. This arrangement provides bearing engagement between the enlarged radius corners of the slat and the corresponding corners of surface 50 to resist reaction forces tending to rotate the shoes about the axis of elongation [*16] of the slat. . . .

'510 patent, col. 3, ll. 26–51. As this passage and the accompanying drawings make plain, "contiguous glide surface 50" is the inner surface of the diverter shoe.

In the preferred embodiment, the glide surface contacts the outer surface of the slat at various points; these points of contact resist the reaction forces that are generated when the diverter shoe pushes an item across the slat. At the upper-left corner and the bottom-right corner of the slat, the slat engages the glide surface's "enlarged radius forward upper corner 64 and . . . enlarged radius lower rear corner 66." Id. at col. 3, ll. 44–45. In the drawings of the preferred embodiment, both the upper-right and bottom-left corners of the slat also appear to make contact with the glide surface. On the top of the slat, the slat engages the glide surface's "support rib 60." Id. at col. 3, l. 41. On the bottom of the slat, a projection off the slat rides within the glide surface's "channel 58." Id. at col. 3, l. 38. The above-referenced parts of the glide surface are depicted (without the slat) in figure 8: n3

GET DRAWING SHEET 4 OF 6.

n3 Support rib 60 is visible but not numbered in this figure; the support rib is numbered in figure 9, set out supra.

[*17]

But in the preferred embodiment, the glide surface also has regions that do not contact the slat. Indeed, regions of noncontact are found on every side of the slat, as can be discerned on close inspection of figure 2:

GET DRAWING SHEET 1 OF 6.

Vanderlande acknowledges that the glide surface in the preferred embodiment has regions that do not contact the slat, but emphasizes that the glide surface includes at least some contact with every side of the slat. Vanderlande's argument is accurate with respect to the preferred embodiment, which includes not only midsection contact points on the top and bottom of the slat, but also contact points at the corners of the slat.

But the "Summary of the Invention" (quoted at length supra) expressly contemplates other embodiments, stating that the invention includes embodiments with contact "between at least one edge [i.e., corner] of each slat and an engaging portion of the glide surface of the diverter shoe." Id. at col. 1, ll. 65–66 (emphasis added). Moreover, while the "Summary of the Invention" describes a midsection contact point on the bottom of the slat, it does not describe a midsection [*18] contact point on the top of the slat. In short, the "Summary of the Invention" teaches that the invention embraces glide surfaces that do not contact the slat on all sides, e.g., a glide surface with contact points only on the bottom of the slat and one corner of the slat. While such glide surfaces may not be optimal — indeed, the "Summary of the Invention" emphasizes that it is preferable to have bearing means at "diagonally opposite slat edges in order to better resist reaction forces about the axis of the slat," id. at col. 2, ll. 1–2 — they do fall within the disclosure of the invention, indicating that the patent requires a broader meaning of "glide surface" than the one pressed by Vanderlande.

Vanderlande argues that statements of Siemens/Rapistan to the European Patent Office ("EPO") during the prosecution of a European counterpart to the '510 patent support Vanderlande's contention that a glide surface must contact the slat on all sides. In the prosecution to which Vanderlande refers, the EPO initially rejected the patent application in view of a prior-art reference, a shoe sorter that used "skids" to stabilize the shoe on the slat. In this prior-art shoe sorter, [*19] the skids were located below the top wall of the slat. Siemens/Rapistan argued to the EPO examiner that if the skids themselves were considered to be the "glide surface," the glide surface would not "surround" the slat as required by the Siemens/Rapistan application:

In Claim 1 of the present [European]

366 F.3d 1311; 2004 U.S. App. LEXIS 8655, *19

application, the slat is defined by a wall which has an upper portion defining the conveying surface, and the wall is surrounded by a glide surface of the diverter shoe. This does not appear to be the case in [the prior art reference]. In annex 1 of the official communication, the Examiner indicated that the planar upper portion [i.e., the top wall of the slat] . . . is surrounded by the skids, but this does not appear to be the case, because the planar upper portion is above the skids.

ALJ Op. at 65 (citations omitted). As the ALJ properly determined, the "distinctions in [Siemens/Rapistan's] counterargument to the EPO have nothing to do with whether or where the 'glide surface' contacts the slat." Id. at 68.

The extrinsic evidence likewise fails to show that those skilled in the relevant art would understand a "glide surface" as having contact on [*20] all sides. At the evidentiary hearing before the ALJ, the expert witness for Siemens/Rapistan and the inventors named on the '510 patent testified that the term "glide surface" had no independent meaning in the art of sortation systems. Vanderlande did not present any evidence to the ITC that the term "glide surface" had any meaning in this art. n4 Instead, Vanderlande argued to the ITC, and contends on appeal, that the term has an "ordinary meaning" that requires contact. The linchpin of Vanderlande's argument is a definition of the noun form of "glide" found in a general-usage dictionary: "a device for facilitating the movement of something; esp: a circular usu. metal button attached to the bottom of furniture legs to provide a smooth surface." Merriam Webster's Collegiate Dictionary (10th ed. 1998). Vanderlande places particular weight on the illustrative example of the button on the bottom of a furniture leg, emphasizing that the furniture-leg button completely contacts both the furniture leg and the floor.

n4 On appeal, Vanderlande asserts that it has found "over 200 patents using the term ['glide surface'] to describe a low friction contact surface" and discovered similar results using an Internet search engine. Vanderlande does not state, however, whether these patents and Internet findings are specific to the art of sortation systems. In any event, Vanderlande did not present this evidence to the ITC, and we thus hold any argument based on this evidence to be waived.

[*21]

Vanderlande's reliance on this illustrative exam-

ple from a general-usage-dictionary definition is unpersuasive, for several reasons. First, Vanderlande misapprehends the proper role of general-usage (as opposed to technical, art-specific) dictionaries in claim construction. Claims are to be construed from the vantage point of a person skilled in the relevant art. To the extent that this artisan would understand a claim term to have the same meaning in the art as that term has in common, lay usage, a general-usage dictionary can be a helpful aid to claim construction. But where evidence — such as expert testimony credited by the factfinder, or technical dictionaries — demonstrates that artisans would attach a special meaning to a claim term, or, as here, would attach no meaning at all to that claim term (independent of the specification), general-usage dictionaries are rendered irrelevant with respect to that term; a general-usage dictionary cannot overcome credible art-specific evidence of the meaning or lack of meaning of a claim term. Cf. Dow Chem., 257 F.3d at 1373 ("We have previously cautioned against the use of non-scientific dictionaries, 'lest dictionary [*22] definitions . . . be converted into technical terms of art having legal, not linguistic significance.'" (quoting Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1478 (Fed. Cir. 1998))). As the ITC properly determined in this case:

Vanderlande's effort to attribute to the term "glide surface" the ordinary dictionary definition of the word "glide" alone is misplaced. Vanderlande did not present any evidence outside of the dictionary definition of the word "glide" to show that "glide surface" has an ordinary meaning in the material handling industry or in the sortation industry. By contrast, [Siemens/Rapistan] demonstrated, through its expert witnesses having personal experience in the material handling and diverter sortation field, that "glide surface" does not have an ordinary meaning, and the [ITC] Staff agreed with this view.

ALJ Op. at 61 (citations omitted).

Second, even if general-usage dictionaries could be useful in circumstances like these, the definition of the noun "glide" cited by Vanderlande — "a device for facilitating the movement of something" — concerns only one word in a two-word claim term and is vague, abstract, [*23] and fails to connote a particular structure. Indeed, Vanderlande does not even rely on the definition itself, but rather on an extrapolation from the illustrative example of the furniture-leg button. Vanderlande's argument rests on a long series of tenuous assumptions: the word "glide" in the claim term "glide surface" is based

366 F.3d 1311; 2004 U.S. App. LEXIS 8655, *23

on the noun form, not the verb form; the characteristics of the illustrative example of the furniture-leg button necessarily obtain with respect to all glides; therefore every "glide surface" must have the characteristics of the furniture-leg button; therefore a glide surface surrounding a three-dimensional structure — like a conveyor-belt slat — must contact this structure on all sides just as the button contacts the floor. Vanderlande's shaky syllogism cannot overcome the uncontroverted testimony regarding the lack of ordinary meaning of "glide surface" in the art of sortation systems.

Third, in any event Vanderlande's dictionary argument is entirely eclipsed by the '510 patent's written description, which provides detailed, art-specific examples of glide surfaces, not only in the preferred embodiment but also in the express contemplation of other embodiments, [*24] including embodiments in which the glide surface does not contact every side of the slat. See Dow Chem., 257 F.3d at 1373 (stating that "any definition found in or ascertained by a reading of the intrinsic evidence may not be contradicted by any meaning found in dictionaries"). As noted above, the "intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language," Vitronics, 90 F.3d at 1582, and this is particularly true where, as here, the written description provides definite and readily discernible guidance as to the intended meaning of a structural claim term. Indeed, it is doubtful whether any extrinsic evidence could contradict or overpower the meaning evident from the written description here, and certainly Vanderlande's furniture-leg button cannot do so.

Vanderlande argues that its construction of "glide surface" is buttressed by the content of a mediation statement prepared by Siemens/Rapistan in connection with the mediation of a prior litigation. The content of this mediation statement, which would be inadmissible in a patent suit in federal district court, see Federal Rule of Evidence 408 [*25]  ("Evidence of conduct or statements made in compromise negotiations is . . . not admissible."), was at most a theory advanced in a proceeding to mediate a separate litigation, upon which we place little — if any — weight in claim construction, cf. Beckson Marine, Inc. v. NFM, Inc., 292 F.3d 718, 726 (Fed. Cir. 2002) ("Litigation theories — to the extent not expressed in claim language, the patent specification, or the prosecution history — do not affect claim scope."). In any event, we have considered the mediation statement (which the parties marked as confidential) and believe it is ambiguous with regard to the claim-construction issue at hand.

We conclude that a "glide surface" is a diverter shoe's inner surface that has some contact, but not necessarily

complete contact, with the outer surface of the slat, and that need not contact all sides of the slat. We note that our construction of "glide surface" is different from the ITC's construction, which did not require any contact at all. We believe the ITC's definition was overly broad. Indeed, the ITC's definition could conceivably embrace "no-contact" technologies far beyond the patent's disclosure, such as [*26]  a glide surface that rides above the slat on air currents, or a glide surface that is magnetized to repel the outer surface of the slat.

Returning to the claim limitation as a whole, we conclude that "glide surface surrounding said [slat] wall" refers to a glide surface (as just defined) that completely encircles the slat. This construction embraces Vanderlande's Mark 2 Posisorter, whose diverter shoe's inner surface has some contact, but not complete contact, with the outer surface of the slat, and which completely encircles the slat.

B. "Glide Surface Having Substantially the Same Configuration as Said Outer Surface of Said Slat"

Vanderlande's second infringement challenge is aimed at the ITC's infringement analysis of the limitation "glide surface having substantially the same configuration as said outer surface of said slat." Vanderlande argues error because the ITC failed to construe this limitation, and asserts that the proper construction is "that the glide surface of the shoe must largely, but not necessarily wholly, resemble the configuration of the outer surface of the slat in every, or largely every, relevant respect."

Vanderlande's argument suffers from several [*27] defects. First, this claim limitation was not in dispute when the ALJ construed the claims, and thus there was no reason for the ALJ to set out a formal construction. See, e.g., U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) (stating that "claim construction is a matter of resolution of disputed meanings" (emphasis added)). Second, the ALJ was plainly attentive to the critical words "substantially the same configuration," stating that "a claim term like 'substantially' is considered to be a 'broadening usage' that 'must be given reasonable scope'; such words 'must be viewed by the decisionmaker as they would be understood by persons experienced in the field of the invention.'" ALJ Op. at 129 (citations omitted); see Optical Disc Corp. v. Del Mar Avionics, 208 F.3d 1324, 1334 & n.4 (Fed. Cir. 2000) (finding no reversible error where the district court "did not articulate a construction of the claims" but did "inferentially set forth its view of the scope of the claims" (emphasis added)). Third, Vanderlande fails to demonstrate any meaningful distinction between the construction it now presses and the ALJ's [*28]  discussion of the effect of the word "substantially." In short, we find no error in the

366 F.3d 1311; 2004 U.S. App. LEXIS 8655, *32

Comm'n Op. at 14–15 (citations omitted). The warnings of potential infringement described by the commission are precisely the opposite of the sort of conduct needed to give rise to equitable estoppel.

In an attempt to overcome these warnings, Vanderlande contends that the failure of Siemens/Rapistan to initiate litigation until July 2001 gave Vanderlande the false impression that Siemens/Rapistan had abandoned its earlier threats. But we agree with the commission's rejection of this argument:

> Nine months after Rapistan confirmed that the accused shoes and slats were being used at the Hub 2000 facility, Rapistan, as it had twice warned Vanderlande it would do, initiated this investigation. In view of these facts, we do not believe that Rapistan's inaction was so unreasonable as to be misleading or that Rapistan's delay in filing

supports an inference that Rapistan did not intend to enforce its patent rights in the United States against Vanderlande.

[*33] Id. at 15. Because Vanderlande cannot meet the first element of equitable estoppel, we need not reach the other two elements.

CONCLUSION

We affirm the ITC's decision holding that Vanderlande violated section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, by, inter alia, importing for sale in the United States the Mark 2 Posisorter. Because we reject Vanderlande's assertions of error by the ITC, we need not reach the alternative arguments for affirmance presented by Siemens/Rapistan.

AFFIRMED.

COSTS

Costs to appellee.